ALEXANDER H. REVELL

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 21, 1898—Rehearing denied February 9, 1899.*

1. WATERS—*title to land submerged by waters of the great lakes belongs to the boundary States.* Title to and dominion over lands covered by the waters of the great lakes are in the several States within which the lands are located.

2. SAME—*erection of piers in Lake Michigan by shore owner constitutes a purpresture.* The erection of piers in Lake Michigan by a shore owner constitutes a purpresture, and is such an unlawful act as warrants the interference of a court of equity upon the filing of an information by the Attorney General.

3. SAME—*purpresture may be abated though not a nuisance.* A purpresture may be enjoined or abated in equity although it is not injurious or a public nuisance.

4. SAME—*littoral owner can do no act to extend his boundary line beyond the water's edge.* One owning land bordering on Lake Michigan has no right to build wharfs or piers for the purpose of increasing the boundary of his premises beyond the water line, nor can he lawfully do any act which may indirectly accomplish that result.

5. SAME—*common law rights of shore owners.* The only rights which one owning land bordering on Lake Michigan has in Illinois are the common law rights of access to the lake from his property, within its width, and to natural accretions.

6. SAME—*rules applicable to owners of river banks do not control owners of shore of Lake Michigan.* The rules governing the riparian rights of the owners on the banks of a river, which permit them to build wharfs, do not apply to littoral owners of lands bordering on Lake Michigan, as the title of a riparian owner extends, in theory, to the thread of the stream, while ownership of the shore of Lake Michigan extends only to the water's edge.

7. SAME—*littoral owner cannot build structures on submerged lands.* One owning land bordering on Lake Michigan may erect structures on his own land to protect it from erosion, if they do not interfere with navigation, but he has no right to build piers or other structures upon submerged land to accomplish that purpose unless authorized by the State.

8. SAME—*private piers in Lake Michigan must be abated at suit of the People.* Piers constructed in the waters of Lake Michigan by owners of the adjoining shore, without the authority of the State, must be abated upon the filing of an information by the Attorney General, whether detrimental to public interests or not.

APPEAL from the Circuit Court of Cook county; the Hon. JOHN GIBBONS, Judge, presiding.

This was an information in equity, brought in the circuit court of Cook county in the name of the People, by the Attorney General, against Alexander H. Revell, as the owner of a certain tract of land bordering on Lake Michigan. The information alleges that so much of Lake Michigan as is included by lines running north from the point where the eastern boundary of the State of Illinois strikes the southern bend of said lake, to a point in the middle of the said lake in north latitude forty-two degrees thirty minutes, and thence west along that parallel, is within the State of Illinois; that the soil or submerged land lying or being under the waters of Lake Michigan aforesaid, within the limits of the State of Illinois, to the line or point on the shores of said lake within the limits aforesaid, belongs to and the title thereto is, by virtue of the common law in force in said State, vested absolutely in the State of Illinois, free from the obstruction and interference of private parties therein; that it is the duty of the State to preserve such waters and submerged lands for the use of the public, to be used and enjoyed by them free and unmolested by erections and enclosures of any kind thereon made by private individuals, or others claiming to own the adjoining shore, without the sanction or authority of said State of Illinois; that no municipal or private corporation or individual has any right, power or authority to exercise exclusive control over the submerged land aforesaid, or to trespass and intrude on the same, by the erection of cribs, piers, jetties, breakwaters, bulkheads, obstructions or enclosures of any kind extending beyond the usual water line on the shore of Lake Michigan, or to re-claim by the means aforesaid, or otherwise, the submerged land so described, the same being subject to the supervision, ownership and control of the State of Illinois as afore-

said; that Alexander H. Revell is now, and for a long time previous had been, the owner of or interested in a certain tract of land, described as follows: Sub-lot 1 in assessor's subdivision of lots 1 and 2 in the city of Chicago subdivision of the east fractional half of section 28, township 40, range 14, east of the third principal meridian, and block 6, (except the west seven feet thereof,) in Gehrke & Brauckmann's subdivision of the south half of the north-east fractional quarter of the north-west fractional quarter of section 28, township 40, range 14, east of the third principal meridian, bordering on said lake, in the county of Cook, Illinois; that said Revell has, by the construction of piers, re-claimed from the bed of the lake a large amount of land (about 250 feet) lying east of the premises described; that the land so re-claimed belongs to the State; that said Revell has further constructed piers of timber and stone 130 to 200 feet at right angles to the shore, upon the submerged land opposite said premises, for the purpose of filling in and re-claiming further large tracts, said piers being extensions of or similar to the structures above mentioned; that the said Revell claims the right, as riparian owner, to re-claim the said lands and to re-claim other lands by the means aforesaid, and disputes the title of the State to such re-claimed and submerged lands; that said structures are solely for the purpose of re-claiming submerged land, and not in aid of navigation or commerce or to protect the land of said Revell from erosion; that said Revell has no right to construct such piers even for the purposes aforesaid; that the said structures are an irreparable injury to the State and a purpresture, and should be abated or seized for the benefit of the State; that there is no remedy at law for the injury aforesaid, wherefore the informant prays a perpetual injunction against said Revell from further filling in and re-claiming; that said piers be abated; that defendant be enjoined from building piers in the bed of Lake Michigan and from doing

any work on said piers, or from filling in any of the bed or encroaching on the water of Lake Michigan.

The answer of said Revell claims the ownership of the land in question from a time long prior to the filing of the information; denies that by the construction of piers he has re-claimed the whole or a large portion of said premises from the bed of said lake; denies he has constructed piers, as alleged in the information, for the purpose of re-claiming land from the lake; avers that he constructed a pier of a permanent character on the south line of his premises, at right angles to the shore, but denies it was made to re-claim submerged land, and avers it was built lawfully, to protect his land from erosion; that prior to its construction there had been violent erosion and his land was threatened with further waste; that said pier was erected to save and protect his land, and does not extend into the waters proper of the lake; denies that it is an intrusion or an interference with navigation; denies that it is a purpresture, and insists that the People have no interest or right in its removal. The defendant further set up in his answer that the information was not brought on behalf of the People, but by the commissioners of Lincoln Park, who are interested in getting a decision as to the rights of littoral owners whose lands they may desire hereafter to condemn and acquire, and who, to get an expression of the courts on that subject, instigated this suit, which is therefore not brought in good faith. The answer concludes with a general denial of allegations not admitted, confessed, traversed or denied.

Subsequently a supplemental answer was filed, in which the defendant set up that since the filing of the answer the commissioners of Lincoln Park had prepared and adopted a plan for the enlargement of Lincoln Park and the location of a boulevard over the bed of the lake opposite to and about 1200 feet east of defendant's premises, the land under the water between said boulevard and the shore line as it existed at the time of the adop-

tion of said plan to be re-claimed for park purposes, and
had made an estimate of the cost of such improvement,
all in accordance with an act of the General Assembly
approved June 15, 1895; that said plan was adopted and
said action taken about March 20, 1896.

Replication was filed to the answer and supplemental
answer, and the cause was referred to the master to take
proofs. A hearing was had on the pleadings and evi-
dence, and the court, in its decree, finds that the cribs,
piers, breakwaters or bulkheads described in said infor-
mation and in the answer filed herein, constructed by the
said defendant, Revell, as charged in said information
and admitted by said answer to have been constructed,
are trespasses on the submerged lands of Lake Michigan,
the title of which lands was, at the time of their erection,
in the State of Illinois, and that they are purprestures,
but finds that they were built for the protection of the de-
fendant's land from erosion by the waters of Lake Michi-
gan; that they are not detrimental to the public interest,
and will not become so until the State of Illinois wishes
to re-claim and use the submerged lands on which they
stand; that the said defendant, and all claiming through
or under him, be and hereby are perpetually enjoined
from building hereafter opposite to or in connection with
his land described in the information, any pier, crib,
breakwater, bulkhead or other artificial device or con-
struction on the submerged lands under Lake Michigan
for the purpose of making any land or re-claiming any
submerged lands for the purpose of protecting the lands
above described from erosion by Lake Michigan, or for
any other purpose whatever; that the said piers, break-
waters or bulkheads now existing opposite and connected
with the said land are, so far as they stand on the sub-
merged lands of Lake Michigan, purprestures, and sub-
ject to abatement by the State of Illinois whenever said
State shall desire to re-claim or use the submerged lands
on which the said piers, breakwaters or bulkheads stand;

that because of its finding that the said purprestures are not detrimental to the public interests and will not become so until the State of Illinois wishes and undertakes to re-claim and use the submerged lands on which they stand, the court does not now order the said purprestures abated; that the said defendant, and those claiming through, by or under him, be perpetually enjoined and restrained from in any manner interfering with the State of Illinois, or with the commissioners of Lincoln Park, as the agents and trustees of the State of Illinois, in their taking possession of the submerged lands of Lake Michigan opposite to, eastward of and 'adjoining the land of the defendant in said information described, up to the water's edge and at the time such possession is taken, and re-claiming the same and using the same for park purposes; that whenever the said State of Illinois, directly or by its said agents or trustees, may choose to take such possession and re-claim and use the said submerged lands up to the water's edge opposite and adjoining the land or lot of the defendant, it may abate and remove, without let or hindrance from the defendant, or those claiming by, from or under him, any structure, piers, cribs, breakwaters or bulkheads found standing on said submerged lands eastward of the said water line, and the said Revell, and those claiming by, through or under him, is and are hereby perpetually enjoined and restrained from any interference with such abatement or removal.

To reverse this decree the defendant prayed for and obtained an appeal.

As will be observed, the court, in its decree, found from the evidence that the piers were built for the protection of defendant's land from the erosion of the waters of Lake Michigan, and that they were not detrimental to the public interest, and would not become so until the State of Illinois wished to re-claim and use the submerged land upon which they stood, and the court refused to order the said purprestures abated until the State of

Illinois directly or indirectly took possession of and reclaimed and used the submerged lands adjacent to the defendant's holdings. Upon these points the appellee has assigned cross-errors.

SMITH, BLAIR & SMITH, for appellant:

A riparian owner has the right to erect such structures in the water as may be necessary to protect the shore from erosion and which will not interfere with navigation. He also has the right to accretions, of access to navigable water and to wharf out for landing. Gould on · Waters, secs. 36, 138-140, 148, 151, 168; Black's Pomeroy on Water Rights, sec. 229; *Diederich* v. *Railway Co.* 42 Wis. 261; *Priewe* v. *Railroad Co.* 93 id. 534; *Yates* v. *Milwaukee,* 10 Wall. 497; *Weber* v. *Harbor Comrs.* 18 id. 65; *Hardin* v. *Jordan,* 140 U. S. 381; *Railroad Co.* v. *Illinois,* 146 id. 435; *Lyon* v. *Fishmongers' Co.* L. R. 1 App. 622; *Shively* v. *Bowlby,* 152 U. S. 11; *Ensminger* v. *People,* 47 Ill. 388; *Chicago Dock Co.* v. *Kinzie,* 93 id. 415; *Fuller* v. *Shedd,* 161 id. 462; *Hanford* v. *Railroad Co.* 43 Minn. 105; *Bradshaw* v. *Railroad Co.* 52 id. 61; *Steam Engine Co.* v. *Providence, etc. Co.* 12 R. I. 361; Angell on Tide Waters, 87, 88, and cases cited.

WILSON, MOORE & MCILVAINE, also for appellant:

The jurisdiction of equity in cases of purpresture, as well as of public nuisances generally, rests in the necessity of preventing irreparable mischief and avoiding vexatious litigation. *People* v. *Davidson,* 30 Cal. 384.

Where it clearly appears that the erection of a pier or wharf in tidal waters, and upon soil thereunder belonging to the State, would not constitute a public nuisance and would not prove injurious to the harbor or to the people of the State, an injunction should not be allowed. 1 High on Injunctions, secs. 759, 760.

The jurisdiction of courts of equity in cases of purpresture and nuisance, though not very frequently exercised, is undoubted. It is founded on the right to restrain

the exercise of that from which irreparable damage to individuals or great public injury would ensue. 2 Waterman's Eden on Injunctions, (3d ed.) 259; 10 Am. & Eng. Ency. of Law, 841; 2 Story's Eq. Jur. secs. 924, 924 *a.*

The jurisdiction of a court of equity to abate an existing or prevent a threatened nuisance, upon information filed by the Attorney General, is limited to those public nuisances which affect or endanger the public safety or convenience and require immediate judicial interposition. *Attorney General* v. *Tudor Ice Co.* 104 Mass. 239.

The nuisance must be clearly established. *District Attorney* v. *Railroad Co.* 16 Gray, 242.

The court will not interfere when the obstruction to the rights of the public is of such a character that it may with equal facility be removed by other constituted authorities and public officers. *Attorney General* v. *Brick Co.* 115 Mass. 431.

There must be a want of adequate, sufficient remedy, and the injury to public rights must be of a substantial character, and not a mere theoretical wrong. *Attorney General* v. *Gas Co.* 3 DeG., M. & G. 304; *Bigelow* v. *Hartford Bridge Co.* 14 Conn. 565; *Spencer* v. *Railway Co.* 8 Sim. 193; *Davis* v. *Mayor,* 4 Kern. 506; *Attorney General* v. *Railroad Co.* 125 Mass. 516; Gould on Waters, sec. 168.

E. C. AKIN, Attorney General, and EDWARD O. BROWN, for the People:

Even if purprestures be of no injury to the public, a court of equity has jurisdiction to abate them in such a suit. Hale's De Jure Maris; Coulson & Forbes on Waters, 15-670; Wood on Nuisances, sec. 84; Waterman's Eden on Injunctions, chap. 11; Story's Eq. Jur. sec. 922; Gould on Waters, sec. 2; Angell on Tide Waters, 200; *Attorney General* v. *Richards,* 2 Anst. 603; *Attorney General* v. *Burridge,* 10 Price, 350; *Attorney General* v. *Parmeter,* id. 378; *Attorney General* v. *Terry,* 9 Ch. App. 423; *Attorney General* v. *London,* 8 Beav. 270; 1 H. L. 440; *Shively* v. *Bowlby,* 152 U. S. 1;

*Attorney General v. Railroad Co.* 20 Ill. App. 287; *Weber* v. *Harbor Comrs.* 18 Wall. 65; *People* v. *St. Louis*, 5 Gilm. 351.

The true question in the case is, what are the riparian or littoral rights of shore owners on Lake Michigan? They are in Illinois the same as the riparian rights of shore owners upon navigable waters in England by the common law, in the fourth year of James I. *Shively* v. *Bowlby*, 152 U. S. 1; *Seaman* v. *Smith*, 24 Ill. 521; *Trustees* v. *Schroll*, 120 id. 518; *Fuller* v. *Shedd*, 161 id. 462.

These rights are, first, the right of accretion, where the accretions are purely natural, and also where they are artificially aided by lawful constructions, and possibly also by such constructions as are unlawful; second, the right of access to the water. No other rights were known to the common law, and by it all constructions on the submerged lands belonging to the State are purprestures, and may be abated. *Shively* v. *Bowlby*, 152 U. S. 1.

The right of access does not involve any right to construct purprestures on submerged lands or to use in any way the bed of the water, but only a right of way over any obstruction that may be by the owner of the submerged lands placed between the littoral owner and the water, or a right of compensation for being deprived of such right of way. *Shively* v. *Bowlby*, 152 U. S. 1; *Austin* v. *Railroad Co.* 45 Vt. 215; *Lyon* v. *Fishmongers' Co.* 1 App. Cas. 662; *Buccleugh* v. *Board of Works*, L. R. 5 H. L. 418.

The cases involving wharfing out on Illinois rivers depend on the ownership of the riparian owner to the thread of the stream. *Middleton* v. *Pritchard*, 3 Scam 509; *Ensminger* v. *People*, 47 Ill. 384; *Chicago* v. *Laflin*, 49 id. 176; *Braxton* v. *Bressler*, 64 id. 488; *People* v. *Supervisors*, 125 id. 23; *Washington Ice Co.* v. *Shortall*, 105 id. 52.

Mr. JUSTICE CRAIG delivered the opinion of the court:

It has been suggested in the argument of counsel for appellant that the People have no interest in this litigation,—that the real parties in interest are the commis-

sioners of Lincoln Park. We do not regard this position as sustained by the record. The suit was instituted in the name of the People, by the Attorney General. The commissioners of Lincoln Park, as a board, have taken no action whatever in reference to the commencement or prosecution of the action, nor have they any interest in the result except such as may be shared by the people at large. So far as appears, the Attorney General, representing the People, brought the action in good faith for and on behalf of the People. The commissioners of Lincoln Park were not made parties to the proceeding nor are they mentioned in the information. It is true that the defendant, by a supplemental answer, undertook to bring into the controversy the rights of the commissioners of Lincoln Park under an act of the legislature; but that matter was not responsive to anything found in the information, and in our opinion it had no proper place in the record. When the commissioners of Lincoln Park undertake to condemn or otherwise appropriate any part of the submerged lands of the lake fronting upon the premises of appellant, then will be the proper time to determine their rights and their powers, but until that time arrives nothing need be said upon that question.

The appellant, as a shore owner, constructed from his premises into the lake two piers, extending from the shore into the waters of the lake some 200 feet, and the main question involved here is his right to build and maintain those structures. A description of the structures so built by appellant in the lake will be found in appellant's argument, substantially as follows: "Defendant purchased the premises in question in July, 1890. The pier at Barry avenue was built by FitzSimons, at Revell's instance, in the fall of 1890, and the addition on the east end in 1891. The whole structure is about 220 feet in length,—20 feet on land and 200 feet in water. The north side consists of close piling and the south of piles six feet apart, with single sheeting. The two sides

are about eight feet apart, and the space between is filled with rip-rap, with two lines of planking on the top to walk on. The pier at George street is not quite so long, and is made of a single row of piling, spaced and sheeted and anchored to piles to the south. At the east end is a bulkhead 8 by 15 feet, filled with rip-rap and covered with plank. The latter was built by the O. B. Green Dredging Company in 1893. Both piers are practically perpendicular to the shore."

The law is well settled in the different States that the title to and dominion over lands covered by tide waters within the boundaries of the several States belong to each State wherein the lands are located. The State holds the fee in trust for the public. The doctrine established in regard to lands covered by tide waters has also been held applicable to lands bounded by fresh water in our large lakes. (*People* v. *Kirk,* 162 Ill. 138; *Shively* v. *Bowlby,* 152 U. S. 9.) In the case last cited it is said: "By the common law both the title and the dominion of the sea, and all rivers and arms of the sea where the tide ebbs and flows, and of all the lands below high-water mark within the jurisdiction of the crown of England, are in the king. Such waters, and the land which they cover, either at all times or at least when the tide is in, are incapable of ordinary and private occupation, cultivation and improvement, and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the king's subjects. Therefore the title *jus privatum* in such land, as of waste and unoccupied lands, belongs to the king as the sovereign, and the dominion thereof *jus publicum* is vested in him, as the representative of the nation, for the public benefit." In *Illinois Central Railroad Co.* v. *Illinois,* 146 U. S. 452, in speaking of this question the court said: "That the State holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner

that the State holds title to soils under tide water by
the common law, we have already shown, and that title
necessarily carries with it control over the waters above
them whenever the lands are subject to use.    *   *   *
It is a title held in trust for the people of the State, that
they may enjoy the navigation of the waters, carry on
commerce over them, and have liberty of fishing therein
freed from the obstruction or interference of private par-
ties." Indeed, the doctrine that the State holds the title
to the lands covered by the waters of Lake Michigan in
trust for the people is not controverted in the argument.
It will not, therefore, be necessary to cite further authori-
ties upon that question.

The appellant here owned the premises bordering on
the lake, but his title to the premises extended only to
the water's edge, and the fee in and to the lands covered
by the waters of the lake was vested in the State and
held by the State in trust for the people.   The fee being
in the State, the important question presented is, whether
appellant, without a grant or other authority from the
State, had the right to go upon the submerged lands and
erect the structures complained of in the information.
This State has adopted the common law as it existed
prior to March 24, 1606,—the fourth year of James I,—
and in the absence of any statute of the State changing
the common law in regard to rights of riparian or littoral
owners the common law as it then existed must control.

Upon an examination of the authorities we think it is
clear that the act complained of in the information was
a trespass upon the lands of the State; that the erection
of the piers in the lake in front of appellant's premises
was a purpresture.   But it is said in the argument that
the erection of the structures complained of was not in-
jurious to the State, and hence there was no basis for
the interference of a court of equity.   We do not concur
in that view.   Although the act complained of was not
injurious and was not a public nuisance, still it was an

unlawful act of such a character as would properly authorize a court of equity to interfere upon the information of the Attorney General, as is well established by the authorities.

Coulson & Forbes on the Law of Waters (p. 15) say: "Any unauthorized intrusion or encroachment upon the soil of the shore, such as the building of quays, piers, moles, etc., is termed a purpresture, and may be abated by the crown or the owner of the shore, or restrained by injunction at suit of the Attorney General, whether they create a nuisance or not. Such purprestures may or may not be nuisances to navigation. Whether they are so or not is a question of fact." On page 670 the authors say: "Any invasion of the right of the crown to the bed of the sea or navigable river is a purpresture, and may be restrained by injunction at the suit of the Attorney General, whether it be a nuisance or not. If the act complained of be merely a trespass upon the property of the crown, and not a nuisance to the navigation, the court will generally direct an inquiry whether it is more beneficial to the crown to abate the purpresture or suffer it to remain."

Wood on Nuisances (sec. 84) says: "A purpresture purely is not indictable, but when a purpresture and encroachment is both a purpresture and a nuisance it is indictable, abatable and punishable as for a nuisance. The remedy for a purpresture simply is by information in equity at the suit of the Attorney General or other proper officer."

Eden on Injunctions, (chap. 11,) in discussing the question, says: "Purprestures,—more properly *pourprestures*,— is derived from the French *pourprise*, and, according to Lord Coke, signifies a close or enclosure,—that is, when one encroaches and makes that safe to himself which ought to be common to many. It is laid down by all the old writers that it might be committed either against the king, the lord of the fee or any other subject, but in its

common acceptation it is at present understood to mean any encroachment upon the king, either upon part of the demesne lands, or in the highways, rivers, harbors or streets. The remedy for this species of injury is either by information of intrusion at common law, or by information at the suit of the Attorney General in equity. In case of a judgment upon an information of intrusion, the erection complained of, whether it were a nuisance or not, was abated. But upon a decree upon an information in equity, if it appeared to be a purpresture without being at the same time a nuisance, the court might direct an inquiry whether it was most beneficial to the crown to abate the purpresture or to suffer the erection to remain and be arrented."

Story in his Equity Jurisprudence (sec. 922) says: "In cases of purpresture the remedy for the crown is either by an information of intrusion at the common law, or by an information at the suit of the Attorney General in equity. In a case of a judgment upon an information of intrusion, the erection complained of, whether it be a nuisance or not, is abated. But upon a decree in equity, if it appeared to be a mere purpresture without being at the same time a nuisance, the court may direct an inquiry to be made whether it is most beneficial to the crown to abate the purpresture or to suffer the erections to remain and be arrented."

Gould on Waters (sec. 21) declares: "There is a broad distinction between the violation of the public right and an invasion of the proprietary interests of the crown. The one creates a public nuisance; the other a purpresture. Any encroachment upon the king, either upon part of the demesne lands or any public rivers, harbors or highways, is called a purpresture. If a littoral proprietor, without grant or license from the crown, extends a wharf or building into the water in front of his land it is a purpresture, though the public rights of navigation and fishery may not be impaired.  *  *  *  The remedy for a

177—31

purpresture is either by an information of intrusion at common law, or by information in equity at suit of Attorney General."

In Angell on Tide Waters (p. 200) will be found this language: "A wharf or pier or other erection may, therefore, be below high-water mark or even below low-water mark, but not necessarily a nuisance though a purpresture. The remedy for a purpresture, it is laid down, is either by information of intrusion at common law, or by information at the suit of the Attorney General in equity. The judicial department of the English Court of Exchequer is divided into one of equity and one of law, and the primary business of the former is to recover any lands belonging to the crown, so that purprestures upon arms and creeks of the sea are proper subjects of information in the Court of Exchequer. The king's Attorney General, on the part of the crown, may proceed, for the purpose of protecting either the *jus privatum* of the king from the purpresture or the *jus publicum* of the subject from nuisance, by information on the king's remembrancer's side of the Exchequer by English bill, praying a personal decree against the defendant in the suit." See, also, *Attorney General* v. *Terry*, 9 Ch. App. 423; *Attorney General* v. *Burridge*, 10 Price, 350; *Attorney General* v. *Parmeter*, 10 id. 378; *Attorney General* v. *London*, 8 Beav. 270.

In opposition to the above authorities the case of *People* v. *Davidson*, 30 Cal. 379, is cited and relied upon. In that case it was held that the district courts of California have no power to decree the destruction or to enjoin the erection of a wharf unless it is or will be a nuisance, or is or will be followed by some form of irreparable damage, or unless it is or will be an appreciable hindrance to the execution of some legislative act relating to fishery or to commerce or navigation. So far as this case is in conflict with the rule established by the authorities cited we are not inclined to follow it. We think the decided weight of authority is that a purpresture may be enjoined

or abated in a court of equity although it is not injurious or not a public nuisance.

But aside from this position, it is apparent from an examination of this record that the construction of the piers was injurious to the State. It is true, the appellant testified that the piers were constructed to prevent erosion and protect his shore bordering on the lake; but it is apparent from the evidence that the effect has been to add new land to his premises, and that the accretions resulting from the construction of the piers have extended the boundary of his premises into the lake. In other words, the erection of the piers has increased appellant's land and diminished the land belonging to the State. This being so, it cannot be said that the construction of the piers was not injurious to the State. The appellant had no right to build piers or "wharf out" into the lake for the purpose of making land or increasing the boundary of his premises, nor had he the right to do any act which would produce that result. As has heretofore been said, the lands covered by the waters of the lake belong to the State, and appellant had no right, by any device whatever, to extend his boundary line beyond the water's edge, and when he did so an injury was inflicted on the rights of the State, which might be inquired into and abated in a court of equity on the application of the Attorney General.

It is, however, insisted that the court erred in decreeing that appellant had no riparian rights as against the State. We do not understand that the decree goes to the extent claimed in the argument. But however that may be, the main question presented by the record and discussed in the argument is, what are the riparian rights of appellant, as a shore owner, on Lake Michigan? There is one riparian right which existed at common law which is not disputed or called in question in the argument, and that is: where land bordering on the lake gradually and imperceptibly encroaches upon the water the accretion

thus made belongs to the shore owner. This riparian right
of appellant was not disturbed or interfered with by the
decree. The shore owner also has another riparian right
which is undisputed: the right of access from his land to
the lake,—in other words, the right to pass to and from
the waters of the lake within the width of his premises as
they bordered on the lake. This right cannot be diverted
or taken from the shore owner without just compensation
being made therefor, as provided by law. These are com-
mon law rights, and, as we understand the law, they are
the only common law rights possessed by the shore owner.
Other rights may have been conferred in different States
by statute, usage or custom, but the question involved
here is whether such additional rights exist in this State.

In the well known case of *Shively* v. *Bowlby, supra,* the
Supreme Court of the United States, after a thorough
examination of the authorities, held that the common
law of England is the law of this country upon the ques-
tion of the rights of a shore owner, except where it has
been modified by the constitutions, statutes or usages of
the different States or by the constitution and laws of
the United States. The court also held that the rights of
these owners have been committed to the several States,
and that each State has dealt with the lands under tide
water within its boundaries according to its own notion
of right and public policy. We are aware of no statute
of this State changing the common law, nor has there
been established any custom or usage which modifies the
common law. What, then, is the common law in regard
to the right of a shore owner to build out from the shore
into the waters of the lake, as was done by appellant in
this case?

In *Shively* v. *Bowlby, supra,* after declaring that it is
settled in England that the title to the soil of the sea,
or arms thereof, below ordinary high-water mark, is in
the king, it is said: "It is equally well settled that a
grant from the sovereign of land bounded by the sea or

any navigable tide waters does not pass any title below high-water mark, unless either the language of the grant, or long usage under it, clearly indicates that such was the intention.  *  *  *  By the law of England, also, every building or wharf erected without license below high-water mark, where the soil is the king's, is a purpresture, and may, at the suit of the king, either be demolished or be seized and rented for his benefit, if it is not a nuisance to navigation.  (Citing many cases.)  By recent judgments of the House of Lords, after conflicting decisions in the court below, it has been established in England that the owner of land fronting on a navigable river in which the tide ebbs and flows has a right to access from his land to the river, and may recover compensation for the cutting off of that access by the construction of public works authorized by an act of parliament, which provides 'for compensation for injuries affecting lands, including easements, interests, rights and privileges in, over or affecting lands.'  The right thus recognized, however, is not a title in the soil below high-water mark, nor a right to build thereon, but a right of access only, analogous to that of an abutter upon a highway.  (*Buccleuch* v. *Metropolitan Board of Works*, L. R. 5 H. L. 418; *Lyons* v. *Fishmongers' Co.* 1 App. Cas. 662.)  'That decision,' says Lord Selborne, 'must be applicable to every country in which the same general law of riparian rights prevails, unless excluded by some positive rule or binding authority of the *lex loci.*'  (*North Shore Railroad Co.* v. *Ryan*, L. R. 14 App. Cas. 612-620, affirming 14 Can. Sup. Ct. 667.)  The common law of England upon this subject at the time of the emigration of our ancestors is the law of this country, except so far as it has been modified by the charters, constitutions, statutes or usages of the several colonies and States, or by the constitution and laws of the United States."

Under the common law as declared in this case,—and it is fully sustained by the authorities,—it is apparent

that appellant, as owner of premises bounded on Lake Michigan, took no title to any submerged lands under the waters of the lake, nor did he, by virtue of being a shore owner, have any right to construct piers upon the submerged lands without the consent of the State.

It is, however, suggested in the argument, that this court, in passing upon the rights of riparian owners upon the Mississippi and other rivers in the State navigable in fact but not navigable at law, has held the shore owner may wharf out from the shore into the stream, and that the same doctrine should be extended to a shore owner on Lake Michigan. Those cases have no bearing here, for the reason that they all are predicated on the theory that the line of the riparian owner extends to the center thread of the stream. Being the owner of the soil under the water he had the right to build such structures on his own land as he might desire, except such as might interfere with the navigation of the stream. Under the rule established in those cases, beginning with *Middleton* v. *Pritchard*, 3 Scam. 510, it was held in *Ensminger* v. *People*, 47 Ill. 384, that a riparian owner in the Ohio river having the title to the land between high and low-water mark, and the right to the exclusive use thereof, had the right to establish a private wharf on his land and make reasonable charges for its use by those navigating the river. The right, however, as is apparent from the rule established in the case, rests upon the ownership of the underlying soil.

Much reliance is, however, placed, in the argument, in *Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 387. It is true that the majority of the court in that case held that a littoral owner of lands bordering on Lake Michigan had the right to wharf out from his premises into the lake in aid of navigation; but upon an examination of that case it will be found that the decision is predicated largely upon *Yates* v. *Milwaukee*, 10 Wall. 497, *Railroad Co.* v. *Schurmeier*, 7 id. 272, and *Dutton* v. *Strong*, 1 Black, 23, or two of

them; and in *Shively* v. *Bowlby*, *supra*, decided two years after the *Illinois Central case*, the doctrine laid down in the three cases above cited seems to have been substantially repudiated. It is there said: "Some passages in the opinions in *Dutton* v. *Strong, Railroad Co.* v. *Schurmeier* and *Yates* v. *Milwaukee* were relied on by the learned counsel for the plaintiff in error as showing that the owner of land adjoining any navigable water, whether within or above the ebb and flow of the tide, has, independently of local law, a right of property in the soil below high-water mark, and the right to build out wharves, so far, at least, as to reach water really navigable. But the remarks of Mr. Justice Clifford in the first of those cases, upon which his own remarks in the second case and those of Mr. Justice Miller in the third case were based, distinctly recognize the diversity of laws and usages in the different States upon this subject. * * * And none of the three cases called for the laying down or defining of any general rule independent of local law or usage or of the particular facts before the court. * * * In *Dutton* v. *Strong* there can be no doubt of the correctness of the decision, for, even if the pier had been unlawfully erected by the defendants as against the State, the plaintiffs had no right to pull it down or injure it, and, upon the facts of the case, were mere trespassers upon the defendant's possessions. * * * In *Railroad Co.* v. *Schurmeier* the question in controversy was whether the plaintiff's patent was limited by the main shore or extended to the outside of the island. The Supreme Court of Minnesota held that by the law of Minnesota, land bounded by a navigable river extended to low-water mark at least, if not to the thread of the river, and that the plaintiff's title therefore extended to the water's edge at low-water mark and included the island, and gave judgment for the plaintiff. (10 Minn. 82.) This court affirmed the judgment, saying the express decision of the Supreme Court of the State was, etc. * * * In *Yates* v. *Milwaukee* the point ad-

judged was, that the mere declaration of the city council that the wharf already built and owned by the plaintiff was a nuisance did not make it such or subject it to be removed by the authority of the city. It was recognized in the opinion that by the law of Wisconsin, established by the decisions of its Supreme Court, the title of the owner of land bounded by a navigable river extended to the center of the stream, subject, of course, to the public right of navigation, and the only decision of that court which this court considered itself not bound to follow was *Yates* v. *Judd,* 18 Wis. 119, upon the question of fact whether certain evidence was sufficient to prove a dedication to the public. The later judgments of this court clearly establish that the title and rights of riparian or littoral proprietors in the soil below high-water mark of navigable waters are governed by the local laws of the several States, subject, of course, to the rights granted to the United States by the constitution."

If the three cases cited did not call for the laying down of a general rule independently of local law or usage in the States, as was held in the *Shively case,* the doctrine laid down in the *Illinois Central case* could not be predicated upon those cases. Moreover, we regard the rule established by the common law as the safer and better doctrine, and as each State has the right to determine for itself the title and rights of riparian owners within its border, we regard it a better policy for all concerned to adhere to the common law rule rather than follow the doctrine laid down in the *Illinois Central case.* Moreover, the learned justice who delivered the opinion of the court in the *Illinois Central case,* in *Webber* v. *Harbor Comrs.* 18 Wall. 57, practically concedes the correctness of the doctrine laid down in the *Shively case.* Mr. Justice Field, in delivering the opinion of the court, while recognizing the correctness of the doctrine that a riparian proprietor whose land is bounded by a navigable stream has the right of access to the navigable part of the stream in

front of his land, and to construct a wharf or pier into the stream, subject to such general rules and regulations as the legislature may prescribe for the protection of the public, said: "In the absence of such legislation or usage, however, the common law rule would govern the rights of the proprietor, at least in those States where the common law obtains. By that law the title to the shore of the sea and of the arms of the sea, and in the soil under tide waters, is in England in the crown and in this country in the State. Any erection thereon without license is therefore deemed an encroachment upon the property of the sovereign, or, as it is termed in the language of the law, a purpresture, which he may remove at pleasure, whether it tends to obstruct navigation or otherwise."

Cases from other States have been cited by the appellant and appellees as sustaining their respective views of riparian rights, but it would extend this opinion to too great a length to enter upon a review of those cases. Moreover, local laws, customs and usages enter so largely into the decisions of the courts in the different States that such decisions cannot, as a general rule, control as precedents here. But if the right to wharf out in aid of navigation existed, as held in the *Illinois Central case*, the rule thus established could have no application here, as the piers erected by the appellant in this case were not constructed in aid of navigation. That is not claimed or pretended from anything appearing in the record.

It is, however, insisted that owners of land bordering on Lake Michigan have the right, as riparian owners, to wharf out in order to protect the shore of their lands from erosion. If a right of this character exists it is one not recognized by the common law. As we understand the common law, any structure placed upon the land of the State below or beyond the water's edge in the waters of the lake is a purpresture, and may be abated in a proceeding instituted on behalf of the People. A shore owner may, no doubt, erect on his own land such structures as

may be necessary to protect his land from erosion, provided such structures do not interfere with navigation, but he has no right to intrude upon the lands of the State unless authorized by the State. Tyler, in his work on Boundaries, (p. 95,) states the doctrine of protection in the following language: "There can be no doubt that by the law of England encroachments cannot be made upon the property of the crown or its grantee, but if an embankment which is lawfully made on a man's own land cause a silting up of sand and mud, whereby soil is gradually gained from the sea, the owner of the embankment would appear to be entitled to this increase, upon the principle laid down in respect to alluvion and reliction. An encroachment upon the king, or upon part of the demesne lands, or on the highways, public rivers, harbors or common streets, is called a purpresture. This word frequently occurs in the judicial reports of both this country and England, and invariably signifies an encroachment of this kind.  *  *  *  A man may raise an embankment on his own property to prevent the encroachments of the sea, although the fact of his doing so may be to cause the water to beat with violence against the adjoining lands, thereby rendering it necessary for the adjoining land owner to enlarge or strengthen his defenses." Wood on Nuisances (sec. 494) says: "Every proprietor of land exposed to the inroads of the sea may erect on his own land groynes or other reasonable defenses for the protection of his land from the inroads of the sea.  *  *  *  But a man has no right to do more than is necessary for his defense, and to make improvements at the expense of his neighbor." Gould on Waters (sec. 160) says: "The owners of lands exposed to the inroads of the sea or of inland waters may erect walls and embankments to prevent the wearing away of the land or to protect it from overflow.  *  *  *  If a sea wall or embankment is erected in tide waters, beyond the limits of the owner's land, it is doubtless illegal at common law, as being a purpres-

ture, since it does not appear that littoral proprietors are authorized, as against the crown or without its sanction, to erect even defenses against the sea below high-water mark."

Reliance is, however, placed by appellant in *King* v. *Comr. of Sewers for Pagham*, 8 B. & C. 355. Expressions may be found in that case that seem to sustain the view of appellant, but upon an examination it will be found that what was said was not necessary to a decision of the case or applicable to the facts involved therein, and we do not regard the expressions used in deciding the case as authority on the question. (See Coulson & Forbes on Law of Waters, 32.) It may be conceded that under the doctrine of protection a shore owner may erect structures on his own land for protection against erosion, but as we understand the law he has no right to enter upon the lands of the State and erect thereon such structures, and when he undertakes to do so he is a trespasser. The State, holding the submerged lands of the lake in trust for the people of the State, would be false to its trust should it permit shore owners to encroach on the public domain and gradually appropriate such property to their own use. Here, in the erection of the structures complained of in the information, there has been a clear violation of the law, and no reason occurs to us why the structures should not be abated on the application of the People.

The decree in this case was in favor of the complainants, but after a careful consideration of the whole record we do not think it goes far enough. We think the cross-errors of appellees are well assigned. The decree will therefore be reversed and the cause remanded on the cross-errors, with directions to the circuit court to enter a decree according to the prayer of the information, in conformity to the views here expressed.

*Reversed and remanded.*