# JOHN B. LOVINGSTON *et al.*

## *v.*

# THE COUNTY OF ST. CLAIR.

1. ACCRETION—*title by, to alluvion on Mississippi river.* The proprietor of lands bounded by the Mississippi river is entitled to all accretions thereto caused by the deposition of alluvion, without regard to the question whether such river is a navigable stream or not.

2. SAME—*alluvion defined.* By the common law, alluvion is the addition made to land by the washing of the sea, a navigable river or other stream, whenever the increase is so gradual that it can not be perceived in any one moment of time. When the public easement is not interrupted, the question of the navigability of the stream, as at common law, does not arise.

3. SAME—*act of Congress in relation to navigable streams.* The act of Congress of 1796, (1 Stat. 468, sec. 9,) which declares all navigable rivers in a certain district, public highways, has no bearing upon this question. The riparian owner has a right to the alluvion, whether the stream be navigable or not.

4. SAME—*attaches only to lands bounded by the river.* Where grants from the United States conveyed land to the then bank of the Mississippi river, so that the river formed one of its boundaries: *Held,* that the grantees and those succeeding them in title were riparian proprietors, and as such would take title by accretion to all the alluvial formations to their lands And it matters not that there were definite calls and lines in the survey, provided the bank of the river was one of the boundary lines. The grant may have been so limited as not to carry it to the middle of the river, and yet not exclude the right to the alluvion.

5. SAME—*partly caused by artificial means.* Where the accretions were slow and gradual, and their formation was facilitated by the construction of coal dykes and other improvements for the benefit of the public, and the adjacent proprietors prevented the soil thus formed from washing away, it not appearing that they would not have been formed without such aids, and it appearing that the improvements so aiding the formation were not constructed for any such purpose, and the proprietors had nothing to do with the erection of such dykes, etc.: *Held,* that the fact that the labor of other persons changed the current of the river and caused the deposit of alluvion on the lands of the adjacent proprietors, could not deprive them of a right to the newly made soil.

APPEAL from the Circuit Court of St. Clair county; the Hon. JOSEPH GILLESPIE, Judge, presiding.

This was an action of ejectment, commenced by the county of St. Clair against John B. Lovingston and the Wiggins Ferry Company, in the St. Clair circuit court, on the 26th day of August, 1870, for the recovery of a tract of land, bounded on the north by the southern line of the first ferry division of the city of East St. Louis, as laid out in the plat of the first ferry division; on the east by the west line of survey No. 579; on the west by the low water mark of the Mississippi river, and on the south by the south line of said survey No. 579 extended to low water mark of the Mississippi river.

The declaration had four counts. The first claimed an estate in fee simple; the second, an undivided three-fourths in fee; the third, the perpetual possession; and the fourth, the undivided three-fourths in perpetual possession.

Appellants pleaded the general issue. The cause was tried by a jury at the October term, 1871. The jury found defendants guilty, and that the plaintiffs were entitled to an estate in fee simple in the premises described.

The plaintiff below claimed title to the land under the act of Congress of July 15th, 1870, granting and donating swamp and overflowed lands of the United States.

The court overruled defendants' motion for a new trial, and rendered judgment on the verdict of the jury for the plaintiff below, from which the defendants appealed.

Mr. WM. H. UNDERWOOD, and Messrs. DAVIS & THOMAS, for the appellants.

Messrs. G. & G. A. KŒRNER, and Mr. LOUIS HOUCK, for the appellee.

Mr. JUSTICE THORNTON delivered the opinion of the Court:

If the land of the riparian proprietor was bounded by the Mississippi, his right to the possession and enjoyment of the

alluvion is not affected, whether the stream be navigable or not. By the common law, alluvion is the addition made to land by the washing of the sea, a navigable river or other stream, whenever the increase is so gradual that it can not be perceived in any one moment of time.

The navigability of the stream, as the term is used at common law, has no applicability to this case. If commerce had been obstructed, or the public easement interrupted, or a question was to arise as to the ownership of the bed of the stream, then the inquiry as to whether the stream was navigable or not, in the sense of the common law, might be pertinent. No such question is presented. On this branch of the case, the only question is, have the United States, or the State, or the riparian owner, the right to the accretion?

If the river is the boundary, the alluvion, as fast as it forms, becomes the property of the owner of the adjacent land to which it is attached. On a great public highway, like the Mississippi, floating an immense commerce, and bearing it to every part of the globe, purchasers must have obtained lands for the beneficial use of the river as well as for the land. Can it be presumed that the United States would make grants of lands bordering upon this river, with its turbulent current, and subject to constant change in its banks by alluvion upon the one side and avulsion upon the other, and then claim all accretion formed by the gradual deposition of sand and soil, and deprive the grantee of his river front? If he should lose his entire grant by the washing of the river, he muse bear the loss, and he should be permitted to enjoy any gain which the ever-varying channel may bring to him. If a great government were to undertake, under such circumstances, to dispossess its grantee of his river front, the attempt would be akin to fraud, and it would lose the respect to which beneficent laws and the protection of the citizen would entitle it.

We then assume that the act of Congress of 1796, (1 Stat. 468, sec. 9,) which declares all navigable rivers in a certain district, public highways, has no bearing upon the questions

to be considered.    The riparian owner has a right to the alluvion, whether the stream be navigable or unnavigable.

Blackstone says (2d book, 262,) as to lands gained from the sea by alluvion, where the gain is by little and little, by small and imperceptible degrees, it shall go to the owners of the land adjoining.    " For *de minimis non curat lex;* and, besides, these owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is therefore a reciprocal condition for such charge or loss."

The same reasoning applies, with all its force, to the lands abutting upon the Mississippi river.

In *Middleton* v. *Pritchard*, 3 Scam. 510, this court said: All alluvions belong to the riparian proprietor, both by the common and civil law.

In the case of *The King* v. *Lord Yarborough*, 3 Barn. & Cress. 91, land gained from the sea by alluvion or projection of extraneous matter, whereby the sea was excluded and prevented from overflowing it, was adjudged to be parcel of the demesne lands of the adjacent manor.

This question has been discussed with profound research and great ability by the courts in Louisiana, as to the accretions upon this same river, and the law clearly announced.

In *Municipality No. 2* v. *Orleans Cotton Press*, 18 Louisiana, 122, it was declared that the right to future alluvial formations was a right inherent in the property, an essential attribute of it, the result of natural law, in consequence of the local situation of the land; that cities as well as individuals had the right to acquire it, *pere alluvionis*, as riparian proprietor; and that the right was founded in justice, both on account of the risks to which the land was exposed, and the burden of protecting the estate.    The court further assimilated the right to the right of the owner of lands to the fruits of a tree growing thereon, and said: "Such an attempt to transfer from the owner of the land to the city the future increase by alluvion, would be as legally absurd as if the legislature had declared that, after the incorporation of the city,

the fruits of all the orange trees within its limits should belong thereafter to the city, and not to the owners of the orchards and gardens."

The same principle was declared in *Banks* v. *Ogden*, 2 Wal. U. S. 57, as applicable to Lake Michigan.

See also, *The Mayor, etc., of New Orleans* v. *The United States*, 10 Peters, 662; *Jones* v. *Soulard*, 24 Howe, U. S. 41.

The same doctrine is fully declared in a recent case: *Warren* v. *Chambers*, 25 Ark. 120.

To determine the title to the accretion, we must ascertain the locality of the land of the adjacent owner. We need not enter upon a discussion of the laws of Congress and of the State, by virtue of which the county claims title, if the land previously granted by the United States was bounded by the river, and the accretion is attached to it.

Hilgard, the surveyor, testified that the accretion was all west of the Condaire tract. The only portion of the field notes we desire to call attention to is the following: "To a post on the westerly side of the river L'Abbe, or Cahokia Creek, thence down the said river or creek, with the different courses thereof," and, "thence N. 85 deg. W. 174 poles to a post on the bank of the Mississippi river, from which thence N. 5 deg. E. *up the Mississippi river, and binding therewith,*" (passing the southwesterly corner of Nicholas Jarrot's survey No. 579, claim No. 99, at 6 poles,) 551 poles and 10 links, to a post northwesterly corner of Nicholas Jarrot's survey No. ——, claim No. 100." This survey was made in 1815. From the copy of the plat of it, from the custodian of the United States surveys, it will be seen that the line along Cahokia Creek meanders with the stream, which was sinuous, and hence the call in the notes, "down the said creek with the different courses thereof."

A further examination of the plat will show that, though the line from " a post on the bank of the Mississippi river," "to a post northwesterly corner of Nicholas Jarrot's survey, claim No. 100," is a straight line, the river bank, as indicated

by the plat, was also straight in 1815. · The Condaire survey embraces three militia claims, which had been surveyed before, and which were confirmed to Jarrot.

One of the Jarrot surveys begins on the bank of the Mississippi, and thence to a point in the river, etc.

The defendants traced title from patents confirmatory of these several surveys, and they also proved title to "Bloody Island," which, when surveyed in 1824, was three-fourths of a mile north of the tract in controversy. .

In behalf of the county, it is assumed that the patent to survey 579 contains no indication that the river is the boundary ; that the west line of the Condaire claim, being the line next to the river, is identical with the west line of the militia claims ; that Condaire took no portion of the militia claims, but only the fractions east of them and between them and Cahokia creek ; that the lands granted were bounded by specific lines, and not by the river, and therefore the grants are limited grants, and the land in dispute is outside of their boundary lines.

Concede that the Jarrot survey did not make the river the boundary, by specific call, yet its beginning was on the bank of the river, opposite St. Louis, and thence it followed the river to a point in it. Hilgard testified that this survey was on the old bank of the river. It is, then, evident that at this time, which was some years prior to the Condaire survey, there was no land between the western line of the Jarrot survey and the river. All the plats introduced in evidence show that the river bank was straight, and the point in the river must have been made for the purpose of obtaining the bearing of the witness tree, a sycamore, 250 links from the point. It is manifest that the river was the boundary, and whether the grant was bounded *by* the river, or *on* the river, can make no difference as to the question involved. The ·grant may be so limited as not to carry it to the middle of the river, and yet not exclude the right to the alluvion.

A large number of cases have been cited by one of the counsel for the county, to establish that a grant is not carried to the centre of a stream, but stops at the bank, if the grantor describes the line as upon the margin, or at the edge or shore, and that these terms become monuments, and that they indicate an intention to stop at the edge or margin of the river.

This may be good law, and not affect the right of the defendants. They do not claim the bed of the stream, and the proof shows that the river does not run over the land in dispute at ordinary stages of water. Their claim, if established, does not obstruct the river, or interfere with its free navigation and use by the public.

But the Condaire survey not only covers the Jarrot surveys, but extends beyond them. It not only takes any fractions between the Jarrot surveys and Cahokia creek, but the land, if any, between their western line and the river. The Condaire survey run up the river and binding therewith, and *passed* the southwesterly corner of the Jarrot survey, No. 579, *at 6 poles.* Language could not make it more plain that the western line was bounded by the river, and the plats confirm this view.

The only construction to be given to these grants is, that the United States had conveyed the land to the bank of the Mississippi. It follows that the grantees were riparian proprietors, and are the owners of the alluvial formations attached to their lands.

Unless such construction be given and adhered to rigidly, almost endless litigation must ensue from the frequent changes in the current of the Mississippi, and the continual deposits upon one or the other of its banks; the value of land upon its borders would depreciate, and the prosperity of its beautiful towns and cities would be seriously impaired.

Counsel say, at the time the locations were made there was no advantage of river front, no wharfage and no wood yards. This may be true, but even at this early period the grantees

must have realized the vast importance of the Mississippi to them, and to all the people of the States bordering upon it, in the grand future soon to be unfolded. They must have seen the necessity, and accepted the grants for the purpose of securing an approach to the river.

From the proof, before 1819 a ferry was established across the river near to the land in dispute, and has been since in constant operation. Before the grant of the swamp and overflowed lands to the State, in 1850, a city had sprung up on the Missouri side of the river, and a prosperous village was growing on the Illinois shore. Before the survey by the county of the swamp lands, in 1852, a charter for a railroad had been granted by the State, which resulted in the construction of a road from Terre Haute, in the State of Indiana, to Illinoistown. Prior to the grant made by the United States in 1870, as shown by the plat offered in evidence, a number of railroad tracks had been constructed upon the ground formed by accretion, and an elevator erected and dykes for the use of wagons, and a large expenditure of money made by the ferry company for the preservation of the banks recently made.

It needed no prophetic eye to foresee, prior to the year 1850, these grand improvements which bring the products of an empire to the father of waters. Their absolute necessity, and consequent construction, as an outlet for our immense produce, had been known for more than a quarter of a century before their completion. Their usefulness would be greatly crippled, and the public thereby seriously suffer, if ready access to the river was denied.

It would be a strained construction, to hold that, in making these grants, the United States reserved all accretions, and thus to deprive these proprietors of ferry privileges and the beneficial enjoyment of the river.

It is further contended that the lands are not accretions, as they were made by artificial, and not natural, means. It is not at all certain, from the proof, that the accretions were entirely the result of artificial structures, or that they would not

have been formed without them. The construction of coal dykes facilitated the formation, and the soil was prevented from washing away by the expenditure of money by the ferry company.

Jonathan Moore, who had known the river since 1813, testified that the accretions had commenced to form before the construction of the dykes, and McClintock and Jarrot testified to the same effect.

Concede, however, that the dykes, to some extent, caused the accretions; they were not constructed for such purpose, and appellants had nothing to do with their erection. They were built for the accommodation of the public, and to secure an approach to the ferry boats, and the city of St. Louis did some work to preserve its harbor. Improvements were also made by the United States to throw the channel of the river towards the city.

The fact that the labor of other persons changed the current of the river, and caused the deposit of alluvion upon the land of appellants can not deprive them of a right to the newly made soil.

Chancellor Kent, after declaring the common law doctrine, that grants of land bounded on the margins of rivers, carry the exclusive right of the grantee to the centre of the stream, unless there is a clear intention to stop at the edge, says : "The proprietors of the adjoining banks have the right to use the land and water of the river, as regards the public, in any way not inconsistent with the easement ; and neither the State nor any other individual has the right to divert the stream and render it less useful to the owners of the soil." 3 Vol. Com. 427.

If portions of soil were added to real estate already possessed, by gradual deposition, through the operation of natural causes, or by slow and imperceptible accretion, the owner of the land to which the addition has been made has a perfect title to the addition. Upon no principle of reason or justice should he be deprived of accretions forced upon him by the

labor of another without his consent or connivance, and thus cut off from the benefits of his original proprietorship. If neither the State nor any other individual can divert the water from him, artificial structures, which cause deposits between the old and new bank, should not divest him of the use of the water. Otherwise, ferry and wharf privileges might be utterly destroyed, and towns and cities, built with sole reference to the use and enjoyment of the river, might be entirely separated from it.

In *Godfrey* v. *The City of Alton*, 12 Ill. 29, the public landing had been enlarged and extended into the river, both by natural and artificial means, and this court held that the accretions attached to and formed a part of the landing.

In *New Orleans* v. *The United States*, 10 Peters, 662, the quay had been enlarged by levees constructed by the city to prevent the inundation of the water, and the court held that this did not impair the rights of the city to the quay.

In *Jones* v. *Soulard, supra*, the intervening channel between the island and the Missouri shore had been filled up, in consequence of dykes constructed by the city, and the riparian owner succeeded.

In the case at bar, the accretions have not been sudden, but gradual, as we gather from the testimony. The city of St. Louis, to preserve its harbor, and to prevent the channel from leaving the Missouri shore, threw rock into the river, and the coal dykes were made to afford access to boats engaged in carrying across the river. The ferry company protected such accretions by an expenditure of labor and money.

The accretions, then, are partly the result of natural causes and structures and work erected and performed for the good of the public. Appellants should not thereby lose their frontage on the river and be debarred of valuable rights heretofore enjoyed. This would be a grievous wrong, for which there would be no adequate redress.

The judgment of the circuit court is reversed and the cause remanded.                                   *Judgment reversed.*