(No. 11238.—Decree affirmed.)

EDWARD J. BRUNDAGE, Attorney General, Appellant, *vs.*
WESLEY L. KNOX *et al.* Appellees.

*Opinion filed June 21, 1917—Rehearing denied October 3, 1917.*

1. WATERS—*what is an accretion.* Accretion is the process of gradual and imperceptible increase of land caused by the deposit of earth, sand or sediment thereon by contiguous waters.

2. SAME—*owner of adjoining land is not entitled to accretions which he has caused by artificial means.* Additions to land fronting on bodies of water, caused wholly by artificial means adopted by the owner of the shore, do not come under the laws as to the ownership of accretions.

3. SAME—*the owner is entitled to accretions caused by natural or artificial means for which he is not responsible.* The right to accretions is a vested right in the owner of the adjoining land whether the accretions are due to natural causes or to artificial conditions created by third persons without connivance or collusion of the owner; and this is true regardless of whether the land borders on a river or a lake. (*Revell* v. *People,* 177 Ill. 468, and *Bliss* v. *Ward,* 198 id. 104, distinguished.)

4. SAME—*the right to accretions is based on right of access to water.* The right to accretions is not based mainly on the right to the title to the submerged lands but rather on the right of access to the water, otherwise owners of the adjoining lands might lose their frontage because of the accretions and be debarred of valuable rights for which there would be no adequate redress.

5. SAME—*what action will not deprive the adjoining owner of right to accretions caused by public improvements.* The adjoining owner, to deprive himself of his right to accretions caused by public improvements, must be more than a mere passive looker-on as to the building of a pier or other purpresture by the city at a location which may aid in causing accretions to his land, and if he was a member of the city council which made the improvement but did not vote on the question he will not be deprived of his right to the accretions because he did not oppose the improvement.

6. SAME—*what is the proper boundary of fresh water lakes.* The true limit to the boundary line of Lake Michigan and other fresh water lakes is the line where the water usually stands when unaffected by storms or other disturbing causes.

7. CONSTITUTIONAL LAW—*constitutional provisions exempting State from suit do not prevent filing of cross-bill where State is*

*complainant.* The constitutional provisions exempting the State from suit are substantially based on the doctrine of the common law and rest upon public policy, but where the State is the complainant a defendant will not be prevented from filing a cross-bill. (*People* v. *Sanitary District,* 210 Ill. 171, distinguished.)

8. SAME—*when Attorney General may ask court to settle title to property involved in suit.* The constitutional provision that the State can never be made a defendant to a suit by consent of the legislature or of its officials does not prevent the Attorney General, in an information charging an owner of land adjoining Lake Michigan with appropriating the submerged land, from asking the court to settle the title to the land in controversy, as such question is germane to the suit.

APPEAL from the Circuit Court of Cook county; the Hon. FREDERICK A. SMITH, Judge, presiding.

EDWARD J. BRUNDAGE, Attorney General, *pro se,* and JAMES H. WILKERSON, (HIRAM T. GILBERT, JOHN C. SLADE, and GERALD G. BARRY, of counsel,) for appellant.

WELLS & TALCOTT, for appellee Wesley L. Knox.

CHARLES L. BARTLETT, and SHERMAN C. SPITZER, for appellees Antonin and Mabel Sterba.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

The original information herein was filed in the circuit court of Cook county July 29, 1912, by the Attorney General, on behalf of the State, and the second amended information on February 2, 1916. Both the original and amended informations charged appellees with the erection of piers and other unlawful structures upon the submerged lands constituting a part of the bed of Lake Michigan and with the appropriation of a part of said submerged lands to private uses. All the defendants named in said informations filed answers which practically admitted the existence of

piers and other artificial structures but all claiming title to said land by the process of natural accretions to the original shore line. Appellee Knox filed a cross-bill seeking affirmative relief. Thereafter a hearing was had before the judge in said circuit court and a decree was entered November 15, 1916, finding that the land in dispute had been formed by natural accretions caused by artificial structures, none of which were erected by appellees, and finding title to all of this artificially made land in Knox and the other appellees claiming under him; that the State of Illinois has no title to any part of said lands, and that Knox and the other persons claiming under him are, respectively, the riparian owners and entitled to all the riparian rights appertaining to their respective premises. From that decree an appeal was taken to this court.

Many witnesses testified before the trial court and much evidence of a documentary character was introduced. The submerged lands alleged to have been thus encroached upon and appropriated are described in the said amended information as all lands lying east of the eastern boundary of the fractional northwest quarter of section 20, township 41, north, range 14, east of the third principal meridian, as the same was located and determined by the United States government surveyors in the year 1839. This fractional quarter section is located just north of what is now Main street, in the city of Evanston. The field notes of the government survey of this fractional quarter, made in 1839 and found in the record, indicate that the meander line of the lake at that point, as then surveyed, substantially represented the water's edge. March 10, 1843, the United States, by patent duly executed, granted to Hannah Kimberly this fractional quarter, the patent stating that it contained 80/100 of an acre according to the official plat of survey. The evidence shows that appellees by *mesne* conveyances obtained all the title of Hannah Kimberly and her heirs and assigns to all of said premises.

The decree found the facts thus far stated, and, among other things, substantially as follows: That the State of Illinois upon its admission into the Union, in 1818, became vested with the title to that portion of the land underlying and forming the bed of Lake Michigan that is within the boundaries of said State, in trust for the people; that theretofore, and thereafter until it parted with its title, the United States of America was the owner of the fee simple title to the adjoining lands on the shore of said lake which are involved herein; that it parted with its title to said fractional quarter section in 1843 to said Hannah Kimberly; that at an early date the owners of lands along the shore of Lake Michigan, both north and south of the premises in question, began the construction of pier structures, extending from a secure point back on their land out into the waters of the lake, for the purpose of protecting their said premises from the action of the waters of the lake; that Knox, acting for himself and T. A. Gratigny and John W. Judkins, purchased, in 1890, that part of the said northwest fractional quarter of section 20 that lies south of the north line of Lee street, in Evanston, extended to the waters of Lake Michigan, subject to the public right for street purposes in the portion thereof that lies between the north and south lines of Lee street, Lee street being the street a block north of Main street; that thereafter Gratigny and Judkins conveyed their interest in said property to Knox; that Knox and his predecessors in title, and appellees claiming title under Knox, have been in the actual, open, notorious, continuous, adverse and exclusive possession of said premises since 1856 under claim of right and title thereto, and for more than twenty years prior to the filing of said information have paid all taxes and assessments levied against the same; that in 1893, and prior thereto, there were piers extending into the waters of Lake Michigan north of the property in question, at Greenleaf, Hamilton, Dempster and Davis streets; that prior to 1881 several piers were built

for Gen. White opposite what is known in this record as the Elliott property, now used as a public park in Evanston; that about 1895 Frank M. Elliott, who was interested in the property last referred to, situated about one block north of that here in question, constructed a pier at Greenleaf street out into the lake to a point about 250 feet east of the west line of section 20, and he also constructed in the lake, upon the submerged land thereof, a breakwater at right angles to this pier and running therefrom north some distance, approximately to the south line of Hamilton street extended; that the effect of this L-shaped structure, which was of a closed, solid and substantial form, was to cause accumulations to form within the same, and also to some extent to the south of the said pier and breakwater, extending to the property in question; that the pier opposite Dempster street, which is about half a mile north of the property in question, was of open piling but covered on top, and was constructed prior to the purchase by Knox of the property in question, and, as finally extended, it ran out into the lake a distance of from 600 to 800 feet from the shore line at Dempster street; that this pier, and the one of somewhat similar character and size at Davis street north of Dempster street, had been constructed and used for years for commercial purposes, but the evidence tends to show that they are now no longer used for any purpose and have largely fallen into decay; that the prevailing currents of the water on the west shore of Lake Michigan are from the north to the south and the currents on the east shore are from the south to the north; that in 1890 the city of Evanston acquired title to the shore property between Lee and Greenleaf streets, being the property immediately to the north of that in question, and soon afterward said city, by the use of brush-filling and other artificial means, reclaimed from the waters of the lake a large amount of the bed of the lake opposite the above property so acquired as a park, and the direct effect of this action on the part of the city

of Evanston has been also to cause an accretion to the property in question; that what is known as the First Park District of Evanston has been formed under the laws of this State and has acquired the above mentioned shore property between Lee and Greenleaf streets, and it is claimed by appellees that this record shows that all of these acts have been sanctioned by the State; that by the laws of this State said park district had been given power to reclaim, hold and possess the submerged lands off· the shore of the lake immediately north of the property here in controversy and to construct and maintain the piers and structures existing thereon for public park purposes; that at Main street, on the south line of the property in dispute, a wooden box-sewer was built, which was replaced by a new brick sewer in 1890 by the village of South Evanston; that the outlet of this new sewer consisted of an iron pipe carried out over the land and out over the waters of the lake about 50 or 60 feet by being suspended by stirrups attached to the timbers of a pier, which was also constructed from the then shore line or water's edge, then about 160 feet east of the west line of said fractional section 20, and extending into the waters of the lake, and that in 1896 this outlet was further extended into the waters of the lake and protected by a pier extending to a point 400 feet from the eastern end of the brick sewer, or 515 feet east of the section line, for the purpose of protecting the sewer. outlet from the action of the waters, this work being done by the municipal authorities from time to time.

The decree further finds that the village of South Evanston had acquired title to the shore land south of Main street to Kedzie street, being the street one block south of Main street, prior to 1886, for the purpose of erecting thereon pumping works, and constructed five or more piers into the waters of Lake Michigan from 80 to 100 feet from the shore, and the city of Evanston, to which the village of South Evanston was annexed in 1892, has filled in the lake

between these piers with materials purchased from different sources, to the ends of the piers, and in some places beyond them, covering up the piers entirely; that in 1890 appellee Knox built a pier out from this property in question, for the purpose, as he claims, of protecting the shore line and preventing erosion upon his land; that this pier extended, at the time it was built, 60 feet east of the then water line; that this pier was never repaired and at the time of the hearing in the circuit court had substantially disappeared, a few posts only being visible; that said pier has either been broken up by the waves or has been covered by the sand of the accretions; that in 1898 Knox constructed a boat-slide of solid closed construction over the submerged land of Lake Michigan from his boat house in order to facilitate the landing of his boat; that the water east of this property was very shallow for a distance east of the edge of the water, and it was difficult to launch his boat in water sufficiently deep to float it without carrying or dragging the boat some distance from the edge of the water; that this boat-slide has also disappeared substantially, for it was never repaired and kept up, and has been carried away by the waters of the lake or by people gathering firewood along the shore; that this boat-slide was a purpresture on the submerged land of the State when it was constructed in 1898, as was also the pier built by Knox in 1890; that the piers heretofore referred to, constructed north of the property in question, and the Main street pier on the southern limits of the property in question, formed a cove in front of said property and caused the sand of the lake to accumulate on the beach; that sand was carried into this cove by the currents of water before mentioned, these currents being doubtless caused, in part, by northeast winds; that the main cause of said accretions in front of the property in question has been the Main street pier; that a pier constructed on the west shore of the lake, extending into the water at substantially a right angle to the shore for a dis-

tance of approximately 75 feet or more from the shore, causes accretions to the shore on the north side of the pier; that the gentle slope of the lake bottom from the shore at this point, and the sand bars lying not far east of the shore, and the piers north and south of the property in question, have all contributed to the accretions which have formed on this property; that the pier constructed by Knox in 1890 was constructed for the purpose of protecting the property in question, and had no appreciable effect in causing accumulations to form on the shore because it did not extend far enough into the water.

The State claims that appellee Knox, by building fences out into the lake on the north boundary of this property at Lee street, caused accretions to be formed, and that he also had placed broken concrete out beyond this fence on the shore in such a way as to cause large accretions. The decree finds that Knox had built a fence and placed concrete and other materials at the end of the fence on the shore; that he extended the fence, from time to time, east as the water at that point receded to the east, and that he placed the broken concrete east of the east line of the fence for the purpose of preventing people from driving teams upon the beach at that point and stealing sand, and that he had a right so to do. The decree further found that neither of the appellees is directly or indirectly responsible for the erection and maintenance of the piers north or south of the property in question, and the accretions which have taken place could not be attributed to anything that appellees have done; that the action of the water in making these accretions doubtless was caused to some extent, as shown by the evidence, by the artificial structures erected north and south of the property here in question. We think the weight of the evidence tends to support the findings of the decree as to the facts stated therein. Any conclusions of law set out in the decree that we consider material we shall have occasion to refer to later.

The evidence further tends to show that in 1839 the greatest width of the premises here in question, at the south or quarter section line, was 118.9 feet, and that in September, 1915, the length of this quarter section line to the water's edge was 400 feet; that the width at the northern end, being the present south line of Lee street, had increased by accretions, whatever the cause, from practically nothing in 1839 to 203 feet in September, 1915. Knox testified that when he became interested in this property, in 1890, the water line at that time at Main street was about where it was in 1881, or 160 feet east of the section line; that at Lee street the water line in 1890 was from 125 feet to 135 feet east of the section line, and according to his testimony, in September, 1915, the water line was substantially 250 feet east of the section line on the south line of the property and from 175 to 180 feet at its northern boundary.

The evidence further shows that in 1857 there was incorporated under the authority of the State of Illinois, by private act, the Evanston Pier Company, having power to construct a pier opposite Evanston, which pier was constructed prior to 1863 at the foot of Davis street; that in 1865 the State authorized Evanston to extend the eastern limits of said town into Lake Michigan as far as 100 feet beyond the east end of the pier then built into said lake opposite said town, being the pier at Davis street; that in 1878 the pier at Dempster street was constructed; that about 1881, or prior thereto, A. W. Fletcher, who testified as a witness for appellees, was employed to build for Gen. White, who then managed the property immediately north of that in question, a series of piers to protect the shore at or near that point; that he put in several piers as directed by Gen. White, the south one being 500 or 600 feet north of Main street; that in 1881 Fletcher built for the village of South Evanston the box sewer in Main street referred to in the decree; that the water's edge at that time was about 160 feet east of the section line and about 45 feet east of

the meander line as indicated by the field notes of the survey in 1839; that the bulkhead of this sewer was at said water's edge; that from this bulkhead the sewer was extended into the lake 80 feet by an iron pipe or outlet protected by a breakwater; that in 1886 the protection for this sewer was in bad condition, and the village of South Evanston, by contract with Patrick E. O'Neil, repaired said protection and maintained the same for five years; that when the brick sewer was constructed, in 1889, in place of said box sewer, the bulkhead of this new sewer was put west of the bulkhead of the box sewer about one-half the distance between the edge of the lake and Arnold avenue, and can still be found there buried in the earth 115 feet east of the section line; that appellees did not buy their property until after this brick sewer was completed, in 1889. There is testimony, also, that the remains of the pier erected by Fletcher for Gen. White near the north line of Lee street were still there at the time of the trial, and, in fact, were seen when excavating there for building purposes at that point; that some time in 1895, while Knox was an alderman of the city of Evanston, a petition was presented to said city authorities to protect the outlet of the brick sewer. This petition was presented to the council by property owners and considered at a meeting of the city council held January 14, 1896, and an ordinance was passed providing for the extension of the said three-foot brick sewer from its eastern terminus to a point 400 feet east of said terminus. Knox himself was not present at this meeting, being on a business trip in the west, and took no part, directly, as to the passage of the ordinance, although he apparently previously suggested to some of those interested in preventing the offensive odor from the sewer that the matter would be best met by presenting such a petition. Pursuant to said ordinance the Main street sewer was extended in 1896 and a solid pier built around the extension out into the lake to a point 515 feet east of the section line, and this pier has

since been repaired by the public authorities and maintained down to the present time. There is evidence tending to show that after the construction of this pier the shore of the lake continued to move eastward.

The evidence also tends to show that appellee Knox, in building the pier and the slide to the boat house, in 1890-1898, understood that he had a perfect right, under the law as it then existed, so to do; that he had been so advised by counsel; that after the decision of this court in *Revell* v. *People,* 177 Ill. 468, rendered in 1899, which, in effect, held that such structures were illegal and could be abated by the State, Knox did nothing to maintain these structures, and they soon became dilapidated and thereby practically abated themselves. The evidence also tends to show, as stated in the decree, that from 1896 to 1910 the city of Evanston kept filling in the submerged lands for the parks to the north and south of this property, and in the park to the north the city extended the shore line east by putting brush out into the water and weighting it down with stones; that the fences built on the north boundary of this property and the concrete and other material thrown in by Knox had disappeared by the action of the elements, the evidence tending to show that none of these structures of such material had been placed in the water but on the shore or edge of the water line; that as the lake continued to recede and sufficient space was left open between the fence and this material, so that people could drive teams through and onto the beach and steal sand, Knox constructed a pine fence down to the water's edge; that this fence was washed away at various times; that there is now left standing the west 25 feet of the fence which was last constructed. The concrete and other material piled there was shown by the evidence to have disappeared, through the action, apparently, of the water and from sinking into the sand of the beach. There is also considerable controversy as to the action of Knox in planting trees and draw-

ing and filling in earth and other material on the disputed
property. The principal evidence in regard to this is the
testimony of Knox himself. According to his testimony
he planted a row of willow trees on the beach, west of the
water line as it then was, and other trees west of the wil-
low trees, and caused to be drawn in earth and material to
raise the ground west of the willow trees. The willow
trees were planted, according to his testimony, for the pro-
tection of the shore line and the other trees west of them
were planted for ornamental purposes. We think that the
weight of the other testimony tends to support him on the
point as to the planting of trees and as to the filling in of
the property in question through their agency.

There is evidence in the record, which is uncontradicted,
to the effect that a pier built along the shore of Lake Michi-
gan at that point, at or about right angles to the shore line,
in order to cause the filling in of earth, must extend at least
75 feet into the water to bring any practical results in caus-
ing accretions or·filling in; that a pier shorter than this
would be of little, if any, practical benefit for that purpose;
that a shorter pier might protect the land but would not
cause any filling in. Under this testimony the pier built
by Knox in 1890 and the boat house built in 1898 were not
built far enough into the lake to cause any appreciable ac-
cretions or filling in because of such structures.

Counsel for the State argue that the evidence introduced
by appellees tends to show that practically all of the accre-
tions on this land, from the time of the original survey, in
1839, to the present time, were caused by artificial struc-
tures along the lake, and they contend, also, that the decree
of the court is wrong in holding that these accretions were
due to natural causes; that even though none of these ac-
cretions were the direct result of appellee Knox's own work
or efforts, or those of his grantors or grantees, "yet the
decree is wrong in holding that these accretions, which were
caused by artificial structures by parties other than appellees

on other property than that which is here in dispute, are not
natural accretions but artificial, and in legal effect are no
different, so far as affecting the title to its property, than
if such accretions had been caused by artificial structures
erected by appellee Knox or his grantors." This we deem
the turning point in this case. An accretion, often used as
a synonym of alluvium or alluvion, has been defined as "a
gradual increase of land by imperceptible accumulation of
land; the imperceptible accumulation of land by natural
causes; the increase or growth of property by external ac-
cessions, as by alluvium naturally added to land situated on
the bank of a river or on the seashore; the increase of real
estate by the addition of portions of soil by gradual deposit
through the operation of natural causes to that already in
the possession of the owner; portions of soil added to that
already in the possession of the owner by gradual deposit."
(1 Corpus Juris, 730.) Again it is said: "Accretion is the
increase of real estate by the gradual deposit, by water,
of solid material, whether mud, sand or sediment, so as to
cause that to become dry land which was before covered by
water. It is said to rest in the law of nature, and is anal-
ogous to the right of the owner of a tree to its fruits and to
the owner of flocks and herds to their natural increase. The
principle applies alike to streams that do and to those that
do not overflow their banks. * * * Accretion being a
gradual and imperceptible addition to land is always to be
distinguished from avulsion, which is a sudden and per-
ceptible loss or addition to land by the action of water or
otherwise." (1 R. C. L. 226.) "Accretion is the process
of gradual and imperceptible increase of land caused by the
deposit of earth, sand or sediment thereon by contiguous
waters." (1 Am. & Eng. Ency. of Law,—2d ed.—467.)

It is undoubtedly the general rule that additions to land
fronting on bodies of water, caused by artificial means by
the owner of the adjoining shore land, do not come under
the laws as to the ownership of accretions formed by purely

natural causes. In *Bliss* v. *Ward*, 198 Ill. 104, this court said (p. 114) "that a shore owner has no right to increase the boundary of his premises by building out into the lake for that purpose, and that the only rights which he has are the common law rights of access from the lake to his land and the right to natural accretions." This court said in *Revell* v. *People, supra,* on page 483: "The lands covered by the waters of the lake belong to the State, and appellant had no right, by any device whatever, to extend his boundary line beyond the water's edge, and when he did so an injury was inflicted on the rights of the State, which might be inquired into and abated in a court of equity on the application of the Attorney General." But the definitions for "accretion" do not always give as one of the essential elements that such deposit of land must be due to natural causes. This court in *Lovingston* v. *St. Clair County,* 64 Ill. 56, stated (p. 58): "By the common law, alluvion is the addition made to land by the washing of the sea, a navigable river or other stream, whenever the increase is so gradual that it cannot be perceived in any one moment of time," and the court held that the land formed by this alluvion became an accretion, with the title in the owner. When the accretion is due, wholly or in part, to artificial causes, and those causes are not the act of the party owning the original shore land, the decisions hold, and justice would seem to require, that the same rules prevail as to ownership of the accretion as in the case of accretions formed solely by natural causes. In *Lovingston* v. *St. Clair County, supra,* it was said (p. 63): "It is further contended that the lands are not accretions, as they were made by artificial, and not natural, means. It is not at all certain from the proof that the accretions were entirely the result of artificial structures or that they would not have been formed without them. The construction of coal dykes facilitated the formation, and the soil was prevented from washing away by the expenditure of money by the ferry company. * * *

Concede, however, that the dykes to some extent caused the accretions, they were not constructed for such purpose and appellants had nothing to do with their erection. They were built for the accommodation of the public and to secure an approach to the ferry boats. * * * Improvements were also made by the United States to throw the channel of the river towards the city. The fact that the labor of other persons changed the current of the river and caused the deposit of alluvion upon the land of appellants cannot deprive them of a right to the newly-made soil. * * * Upon no principle of reason or justice should he be deprived of accretions forced upon him by the labor of another without his consent or connivance and thus cut off from the benefits of his original proprietorship. If neither the State nor any other individual can divert the water from him, artificial structures which cause deposits between the old and new bank should not divest him of the use of the water, otherwise ferry and wharf privileges might be utterly destroyed, and towns and cities built with sole reference to the use and enjoyment of the river might be entirely separated from it. In *Godfrey* v. *City of Alton,* 12 Ill. 29, the public landing had been enlarged and extended into the river both by natural and artificial means, and this court held that the accretions attached to and formed a part of the landing. In *New Orleans* v. *United States,* 10 Pet. 662, the quay had been enlarged by levees constructed by the city to prevent the inundation of the water, and the court held that this did not impair the rights of the city to the quay. In *Jones* v. *Soulard,* 24 How. 41, the intervening channel between the island and the Missouri shore had been filled up, in consequence of dykes constructed by the city, and the riparian owner succeeded. * * * The accretions, then, are partly the result of natural causes and structures and work erected and performed for the good of the public. Appellants should not thereby lose their frontage on the river and be debarred of valuable rights heretofore enjoyed. This would

be a grievous wrong, for which there would be no adequate redress." This decision by this court in *Lovingston* v. *St. Clair County, supra,* on this question, has never been overruled or in any way modified.

Counsel for the appellant concede this doctrine as laid down in that case but insist that it should not apply in a case of this kind because in that case the riparian owner owned the land to the center of the stream and therefore owned the submerged land; while in this case the riparian owner only owned the land to the edge of the water. No such distinction is attempted to be made in that case, and other authorities always cite this case as an authority, regardless of the question whether the land is bordering on a river, a lake or the sea. "It has been stated also by some writers that the accretions or alluvion must be the result of the natural action of the water, but the better view seems to be that the addition by way of alluvion may as well be due to the combined influence of natural and artificial causes." (1 Am. & Eng. Ency. of Law,—2d ed.— 468, and cases cited, *Lovingston* v. *St. Clair County, supra,* being cited as one of the authorities to support this conclusion; see, also, to the same effect, 29 Cyc. 351, and 1 Ency. of Law & Proc. 805, and cases cited.) "The authorities are generally agreed that the riparian owner will not be permitted to increase his estate by himself creating an artificial condition for the purpose of effecting such an increase, and that the doctrine of accretion does not apply to land reclaimed by man through filling in land once under water and making it dry. The title to land thus filled in remains where it was before unless the filling in was done wrongfully by another, in which case it will pass to the riparian proprietor. But if the accretion is indirectly induced by artificial conditions created by third parties it would seem that the right of the riparian owner to such accretion would not be affected, and such appears to be the holding of a majority of the cases, although there are a number of re-

spectable authorities supporting the opposite view." ·( 1 R.
C. L. 233.) The *Lovingston* v. *St. Clair County case,*
*supra,* was taken to the Supreme Court of the United States
and affirmed, (23 Wall. 46,) and that court in discussing
this point stated (p. 66) : "It is insisted by the learned
counsel for the plaintiff in error that the accretion was
caused wholly by obstructions placed in the river above, and
that hence the rules upon the subject of alluvion do not ap-
ply.   If the fact be so, the consequence does not follow.
There is no warrant for the proposition.  The proximate
cause was the deposits made by the water.  The law looks
no further.  Whether the flow of the water was natural or
effected by artificial means is immaterial."

None of the cases make the distinction contended for by
counsel for appellant in this case, that the accretions, when
caused or aided by artificial conditions created by third par-
ties, belong to the owner only upon rivers and not upon
lakes or the high seas.  We find no decisions or authorities
that make any such distinction.  The owner of the adjoin-
ing land has the title to the land formed by accretions, and
this is the law as to the sea where the king or State owns
the bottom of the sea, or on large inland lakes, such as Lake
Michigan, as well as on the navigable and non-navigable
rivers.  "And as to lands gained from the sea, either by al-
luvion, by the washing up of sand and earth so as in time
to make terra firma, or by dereliction, as when the sea
shrinks back below the usual water mark, in these cases the
law is held to be that if this gain be little and little, by small
and imperceptible degrees, it shall go to the owner of the
land adjoining, for *de minimis non curat lex;* and, besides,
these owners being often losers by the breaking in of the sea
or at charges to keep it out, this possible gain is therefore a
reciprocal consideration for such possible charge or loss."
( Sharswood's Blackstone, book 2, *261 ; see, also, Angell on
Water-Courses, 49; Angell on Tide Waters, 249 ; 1 Farn-
ham on Waters and Water Rights, sec. 69 ; Gould on Wat-

ers,—3d ed.—sec. 155; Hall on the Seashore, 109.) And
this rule holds good as to the ownership of land formed by
accretions when such formation is due, in part or wholly,
to artificial causes or improvements made by third persons.
(*Rex* v. *Yarborough*, 1 Eng. Rul. Cas. 458, and cases cited
in note; see, also, authorities heretofore cited.) And this
rule as to the right and title to the accretions being in the
adjoining owner has been held to be the law by the courts of
various States as to rivers, where the title to the bed of the
river before such accretions formed was in the State and
not in the adjoining owners, this being similar, in principle,
to the ownership of accretions arising from the submerged
lands on Lake Michigan. *Fowler* v. *Wood*, 73 Kan. 511;
*Frank* v. *Goddin*, 193 Mo. 390; *Tatum* v. *City of St. Louis*,
125 Mo. 647.

Counsel for appellant argue that if this rule be adhered
to in such a situation as this we are overruling, in effect,
the beneficial results of the decisions in *Revell* v. *People*,
*supra*, and *Bliss* v. *Ward*, *supra*. We think this conclusion
as to the ownership of accretions, even though formed, in
part, by artificial improvements made by third persons, is
in accord with those holdings. In *Bliss* v. *Ward*, *supra*,
the court said (p. 121): "If the park were extended by
natural accretions no one would deny that the whole would
be subject to the same conditions and limitations annexed
to the original dedication, and where the city has been per-
mitted, as the owner in fee, to extend it by filling in the
shoal waters along the shore line, we are unable to see how
any different rule can prevail. In either case the extension
grows upon the original park and becomes corporate with it
and part of it,—in the one case by natural process, and in
the other by artificial means, with the assent of the State."
According to the evidence in this case these accretions were,
in part, caused or created by natural causes, added to and
increased, doubtless, by artificial means or improvements
made by third persons, with no collusion or connivance on

the part of the owner, and assented to by the State when it granted the right to build and create and keep in repair the park improvements both north and south of the property here in dispute. As to the title of the adjoining owner to the property made either by natural or artificial means and brought about by third persons, see, also, the reasoning in *Randolph* v. *Hinck,* 277 Ill. 11, and *City of Chicago* v. *Ward,* 169 id. 392.

The right to accretions or alluvion is a vested one. "Whether it is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same. * * * It is an inherent and essential attribute of the original property. The title to the increment rests in the law of nature. It is the same with that of the owner of a tree to its fruits and of the owner of flocks and herds to their natural increase." (*Lovingston* v. *St. Clair County,* 23 Wall. 46.) This right is not mainly based, as argued by counsel for appellant, upon the right to the title to the submerged lands, but largely, if not chiefly, upon the right of access to the water, otherwise the owners of lands along Lake Michigan might, by losing their frontage by accretions, be debarred of valuable rights for which there would be no adequate redress. We think, therefore, by reason and by the great weight of authority, it must be held that the owner of land bordering on Lake Michigan has title to land formed adjacent to his property by accretions, even though the formation of such accretions is brought about, in part, by artificial conditions created by third parties. In this case, should a different rule be applied because of anything done by appellee Knox, it being shown by the record that he was an alderman in Evanston when the Main street pier was repaired and extended in 1895 and 1896, and it being also manifest from the evidence that the Main street pier had much to do with bringing about these accretions in the last twenty years? There is no contradiction in the record of his testimony that the only part he took in bringing this

about was to suggest to some of his neighbors who were talking about the necessity of repairing or doing something with the Main street sewer outlet, that they file a petition with the city council, of whom he was then a member, but that he did not vote in the council with reference to the matter, although it appears that he was a member of the sewer committee and doubtless was advised with concerning the improvement.

It is insisted by counsel for appellant that Knox ought to be held liable because he did not actually oppose this improvement by the public authorities, and that in order to be entitled to be held free from participation in causing this accretion he should have resisted such improvement. We find no reasoning in any of the authorities that would justify such a conclusion. The reasoning in *Bliss* v. *Ward, supra,* and *Revell* v. *People, supra,* is not to that effect. To bring a case within the rule laid down in those cases, in our judgment, the adjacent owner must be more than a mere passive looker-on as to building a pier at the boundary line of his property or the building of other purpresture by public authorities at a location which may aid in causing the accretions. It is clear from this record that when the extension of the brick sewer was made, in 1896, when Knox was a member of the city council of Evanston, the condition of the sewer, which then extended over 100 feet beyond what is claimed by appellant as the proper shore line, was very bad; that the offensive odors were most pronounced, and that in order to protect the health of the people of the city it was necessary to do something as to the sewer outlet at this point. There is no proof of any character that Knox was active in promoting the action of the city council. As he was the alderman of the Evanston ward in which this sewer was located it was perfectly natural that his neighbors would go to him to complain and for advice as to the steps to be taken to remedy the conditions. If the rule of law should be laid down on this record that is contended

for by counsel for appellant, then we cannot see why the owner of riparian property should not in the same way be compelled to attempt to stop the erection of a pier or other purpresture when it is being constructed entirely on land other than his own, whether adjacent to or far from his own land, on the ground that the effect of such structure would be to cause accretions on his own land, and that unless he resisted such construction he would be estopped from claiming title to such accretions. Such, under the authorities, is not the law.

Counsel for appellant further insist that the court erred in decreeing that the eastern line of the disputed premises "is the water line of Lake Michigan as it exists from time to time when free from disturbing causes." It is contended by them that the decree should have placed the title in appellees, if at all, only to the ordinary high-water mark of Lake Michigan, and if we understand the argument, it is that the high-water mark is to be found at the line up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation constituting what may be ordinarily termed an ordinary agricultural crop. Counsel cite and rely on *Seaman* v. *Smith,* 24 Ill. 521, as supporting this conclusion. At the conclusion of the opinion in that case the court lays down this rule (p. 525): "We are therefore clearly of opinion that the line at which the water usually stands when free from disturbing causes is the boundary of land in a conveyance calling for the lake as a line. This was the rule upon which the court below acted, and the judgment must be affirmed." This rule as laid down in that case has always been referred to with approval and repeatedly quoted by this court as the rule applying to the boundary line of Lake Michigan or other fresh water lakes in this State.

Counsel for appellant especially rely upon the statement in the opinion in *Seaman* v. *Smith, supra,* which commences,

"Yet the rules that govern boundaries on the ocean govern this case." Reading that entire opinion together, we think counsel are wrong in the construction they put upon this sentence. The court said there (p. 524): "If highwater mark is the point at which his land terminates then this judgment should be reversed, but if, on the contrary, the line where the water usually stands when unaffected by storms and other disturbing causes is the boundary then the judgment must be affirmed. * * * The great lakes of the north present questions affecting riparian rights that are different from those arising under boundaries on the sea, upon rivers or other running streams. They have neither appreciable tides nor currents, nor are they affected, like running streams, by rises and falls produced by a wet or dry season, yet the rules that govern boundaries on the ocean govern this case." The opinion goes on to discuss the question of the rules governing tide water boundaries, and then states: "These great bodies of water having no currents, like rivers and other running streams, cannot present the same reasons why the boundary should be extended beyond the water's edge, where it is ordinarily found, that apply to running bodies of water. Where such streams are called for as a boundary, the thread of the current is held to be the line from each side. Such a rule could not, for the want of a current, be adopted in this case." It is clear from the reasoning and conclusion in that case, in the light of the judgment entered, that it was not the high-water mark that was taken as the true limit of the boundary line, but the line where the water usually stood when unaffected by storms or other disturbing causes. In *Fuller* v. *Shedd,* 161 Ill. 462, the court quoted with approval from *Trustees of Schools* v. *Schroll,* 120 Ill. 509, the following (p. 487): "But an entirely different rule applies when land is conveyed bounded along or upon a natural lake or pond. In such case the grant extends only to the water's edge." In *People* v. *Kirk,* 162 Ill. 138, this court, in discussing the ad-

jacent property owner's right to the land along the shore of Lake Michigan, quoted with approval from *Seaman* v. *Smith, supra,* the following (p. 146) : "We are therefore clearly of the opinion that the line at which the water usually stands when free from disturbing causes is the boundary of land in a conveyance calling for the lake as a line." See, also, to the same effect, *City of Chicago* v. *Ward, supra,* page 406.

Counsel for appellant cite and rely especially upon the reasoning of this court in *Cobb* v. *Commissioners of Lincoln Park, 202* Ill. 427, and *Bliss* v. *Ward, supra,* and argue that this court in those cases laid down the rule here contended for, that the high-water mark, and not the water line when free from disturbing causes, should be taken as the boundary line of lands for property owners along Lake Michigan. We find nothing in the reasoning in those two cases that tends to uphold this contention of appellant. The court in both those cases was discussing the right of the owner to the submerged land of the lake, and statements upon which counsel for appellant rely in those cases were made purely with reference to that question and not with reference to where the shore line was. This court in *City of Peoria* v. *Central Nat. Bank,* 224 Ill. 43, on page 56, again approved the doctrine laid down in *Seaman* v. *Smith, supra,* holding that the line at which water usually stands "when free from disturbing causes is the boundary of land in a conveyance calling for Lake Michigan as a line."

As we understand the point of appellant's argument on this question, it is, in effect, that appellees never practically owned to the ordinary water line of Lake Michigan adjacent to this property. So far as the record shows, according to their argument, within the recollection of the witnesses Lake Michigan was never free from disturbing causes by the piers or other purprestures adjacent, north or south, to this land, and that therefore the line of the water of Lake Michigan when free from disturbing causes could

only be found by the line located by the government sur-
veyors in 1839. This argument necessarily is contrary to
the conclusion we have reached as to appellees' right to ac-
cretions which have been formed, in part, by artificial con-
ditions created by third parties. If this opinion is right in
its conclusion on that point, then this argument on the ques-
tion of the boundary line of the lake is without force, for
this court has always held, as it did in *Revell* v. *People,
supra* (p. 484) : "The shore owner also has another ripa-
rian right which is undisputed: the right of access from
his land to the lake. * * * This right cannot be diverted
or taken from the shore owner without just compensation
being made therefor." As heretofore stated, counsel for
appellant seem to rely upon the fact that the title to sub-
merged land being in the State, renders it, as a practical
question, impossible for an owner adjacent to Lake Michi-
gan to obtain title to accretions to his land because he does
not have title to the submerged land. The court stated in
*City of Peoria* v. *Central Nat. Bank, supra* (p. 56)`: "The
whole doctrine of accretions rests upon the right of access
to the water, and it must be convenient access. The right
to preserve his contact with the water is one of the most
valuable of a riparian owner." This doctrine is in accord
with all the authorities on this question. The cases cited
from Minnesota and Iowa on the question of the high-water
mark being the proper boundary line between Lake Michi-
gan and the adjacent owners, in view of our own decisions
on this question we do not consider in any way controlling,
and therefore we do not deem it necessary to discuss or
distinguish them, as in our judgment the doctrine laid down
in those cases could not be followed without overthrowing
the repeated decisions of this court on the question here
under discussion.

The decree of the circuit court rightly fixed appellees'
easterly boundary as the edge of Lake Michigan when free
from disturbing causes.

We find a controversy in the briefs as to what the evidence shows as to the effect of the waters of Lake Michigan, in connection with its currents, waves, storms and other fluctuations, upon the west shore of said lake, at and adjacent to the property in controversy. The appellant contends that the evidence shows that if free from the disturbing causes of piers and other purprestures in the waters of the lake the tendency would be for the wind and water to gradually wear away the shore and move the shore line westward of the original survey line made by the government surveyors in 1839. Counsel for appellees contend that the natural tendency of the shore is to move eastward, and that the testimony of witnesses Fletcher, Barber, Moore and Condit, all of whom testified more or less directly on this point, tends to support their contention. We do not think the evidence is conclusive either way on this question. Some of the witnesses testified that it was impossible to tell what the natural tendency would be. It seems clear from the evidence that this conclusion is correct, because ever since any of them have had any recollection about the matter there have been piers and other disturbing causes which would interfere with the natural tendency of the winds and waves on this shore, and therefore we think it is impossible to find with any certainty from the evidence in the record whether the natural tendency of the wind and the water of Lake Michigan is to wear away this shore, or whether there would be natural accretions to the shore if there were no disturbing causes and the boundary would naturally move eastward. We think the testimony shows clearly that whenever water has sufficient velocity to carry particles of sand it has a scouring effect, and only deposits sand when its velocity is reduced below the point where it will carry the sand; that as the volume and velocity of the water thrown upon the shore increase the undertow increases, and as long as the velocity of the undertow exceeds the velocity sufficient to carry sand it also has a scouring effect. It would seem

to follow, therefore, that the storms erode and the quiet waters deposit sand, and that the question of eroding or depositing is dependent, in part, upon the height of the water, the contour of the shore, the existence of piers and the frequency of the storms.

Counsel for appellant further insist that this rule should not be applied to appellee Knox or his grantees, because by the evidence it is shown that the constructions Knox himself placed upon his land were the approximate cause of a considerable portion of the accretions, while counsel for appellees deny that anything done by Knox added in any appreciable manner to the formation of the accretions. Conceding, however, that appellant is right that the pier and boat-slide built by Knox did add, temporarily at least, somewhat to the accretions on the land, it is uncontradicted from the record before us that this pier and boat-slide have practically disappeared at the present time, and the weight of the evidence tends to show that the shore line as it now exists at this point, caused by the accretions to the land, would have existed practically as it does now if Knox had not constructed the pier or boat-slide, for the record seems to show conclusively that the shore line is now east of the farthest eastern limit of both of these structures. It also seems obvious from the record that there has been for over twenty years a pier extending some 300 feet into the waters of Lake Michigan immediately south of this property, at the end of Main street, and for at least ten years before that the pier extended about 100 feet into the water, and that there is now a pier extending about 100 feet into the water from the end of Lee street, immediately north of this property, and that neither Knox nor any of his grantors or grantees had anything to do with constructing these piers, except, as heretofore stated, as to Knox being alderman; that these piers are now, both of them, adjacent to public parks and are being kept in repair by public authorities. It also seems clear from the record that there is a public park

immediately south of Main street and another immediately north of Lee street, and that the shore line of the land constituting the parks is practically continuous in position with that along this property and fully as far east, and that several blocks north, at Dempster street, the made land extends into Lake Michigan for a public park over 100 feet farther into the lake than is the shore line adjacent to this property, and that the creation of these parks has been sanctioned, if not originally created, by State authority; that if appellant's contention be upheld appellees would be compelled to have their lines on the east put farther back than any of the shore line north or south adjacent thereto. In view of the facts in the record before us, proved both by documentary and oral evidence, we can reach no other conclusion than that the decree is supported by that evidence and is in accord with the law.

We find in the briefs extensive discussions and citations of numerous authorities as to whether the burden of proof to establish title to this disputed property rests upon the State or upon appellees, counsel for appellees claiming that when the State sues as complainant it subjects itself to and is bound by the rules of equity the same as an individual suitor, and that as it is the complainant in this case the burden rested upon the State not only to establish the title but also to show that appellees had no title and that their possession was wrongful. They also argue at length that the State is estopped from acquiring any of the relief demanded in the information, by gross *laches* and long acquiescence in the use of the property in dispute by Knox, his grantors or grantees, while appellant argues just as earnestly that the doctrine of estoppel or *laches* or acquiescence does not apply against the State when acting in its governmental capacity, and that it was so acting with reference to the lake shore opposite this property and the property in that vicinity. In view of the conclusion that we have reached as to title to the disputed accretions on the facts in

this record it is unnecessary for us to consider or discuss any of these questions.

Counsel for appellant further contend that the trial court erred in allowing appellee Knox to file a cross-bill in this suit and in decreeing affirmative relief thereunder. Appellant moved to strike this cross-bill from the files, but the motion was overruled. Thereafter appellant filed an answer thereto, in which he alleged, among other things, that the cross-bill was improperly filed against him because of the constitutional provision forbidding all persons from making the State of Illinois a defendant in any suit at law or equity. The State of Illinois, by act of its legislature, on February 24, 1909, passed a resolution reciting that the rights of the State to land along the shore of Lake Michigan had been usurped by private individuals and appointed a committee to make an investigation with reference thereto. Said committee reported to the legislature, and that body adopted the report, and directed the Attorney General to investigate the matters set forth therein, and, if in his judgment the interest of the State required, to institute action for the purpose of regaining the title to the land here in question. Based on that action of the legislature the Attorney General of the State filed the original information. The amended information, under which this proceeding was heard, prayed the court to compel appellees to disclose and establish by proper proof their respective rights, title and interest to said lands, and to decree that said appellees had no right, title or interest therein which was superior to or different from the right, title or interest of all the people of this State, and that the title to said lands was in this State in trust for all of the people. Section 26 of article 4 of the constitution provides that the "State of Illinois shall never be made defendant in any court of law or equity." In *People* v. *Sanitary District*, 210 Ill. 171, the court, in construing this section, said (p. 173) : "Whenever it becomes necessary to the proper disposition of a cause, courts will

look beyond the mere forms of pleading or the relation or place of the parties to or in the title of the cause, and from their real interests and the effect the adjudication may have upon their rights, determine their true position in the cause, whether that of plaintiff or defendant. When the cross-petition on the part of the State was filed, if it could be regarded as a party it was as a defendant. The Attorney General cannot, as we think, waive the State's immunity from being placed in the position of a defendant. Nor can he commit or bind the State by filing a cross-petition, the result of which is to place the State in the attitude of defendant in the proceeding." That was a condemnation suit brought by the sanitary district, and the Attorney General intervened on behalf of the State. Both parties to this litigation claim that *People* v. *Sanitary District, supra,* is decisive of the contention in their respective favors on the point here under consideration. There is no question that this provision of the constitution must be observed by the courts, as held in the case just cited. The precise question here, however, has never been decided by this court. This question turns on whether, by filing the cross-bill, a suit is brought against the State. A cross-bill is "a defense to an original bill or a proceeding necessary to a complete determination of a matter already in litigation. * * * It is treated as a mere auxiliary suit or as a dependency upon an original suit." (Story's Eq. Pl.—10th ed.—sec. 399; see to the same effect, 2 Daniell's Ch. Pl. & Pr.—6th Am. ed.—*1549, *1550.) "A cross-bill is generally considered and used as a matter of defense, and therefore * * * the first cause and the cross-bill are but one cause." (*Field* v. *Schieffelin,* 7 Johns. Ch. 252.) "Both the original and cross-bill constituted but one suit, so intimately are they connected with each other." (*Kemp* v. *Mackrell,* 3 Atkyns, 812.) "A sovereign State cannot be forced into court against her consent, but a cross-bill presupposes that the plaintiff is already in court rightfully, and when the State

comes into court of her own accord and invokes its aids, 'she is, of course, bound by all the rules established for the administration of justice between individuals.' * * * As by her own volition she is already in court, and as the cross-bill is but a part of the defense to her suit, ancillary to and dependent upon it, we hold that she has by her own act subjected herself to all the rules established for the administration of justice between individuals and must make her defense to this cross-bill." (*Port Royal & A. Ry. Co.* v. *State,* 60 Fed. Rep. 552.) "But although direct suits can not be maintained against the United States nor against their property, yet when the United States institute a suit they waive their exemption so far as to allow a presentation by the defendant of set-offs, legal and equitable, to the extent of the demand made or property claimed, and when they proceed *in rem* they open to consideration all claims and equities in regard to the property libeled. They then stand in such proceedings, with reference to the rights of defendants or claimants, precisely as private suitors, except that they are exempt from costs and from affirmative relief against them beyond the demand or property in controversy." *The Siren,* 7 Wall. 152. See, also, to the same effect, *State* v. *Kilburn,* 81 Conn. 9; *United States* v. *Beebee,* 17 Fed. Rep. 36; 36 Cyc. sec. 910.

Counsel for the State insist that none of the above decisions are based upon a constitutional provision such as ours. Our constitutional provisions, as those of other States, are substantially based on the doctrine of the common law, which rests upon reasons of public policy, that "the exemption from direct suit is without exception. This doctrine of the common law is equally applicable to the supreme authority of the nation, the United States. They can not be subjected to legal proceedings, at law or in equity, without their consent." *The Siren, supra,* p. 154.

It is further insisted by appellant that the rules laid down in the authorities quoted from do not apply to a suit

which the State instituted in its sovereign capacity. We find no authorities that support this argument. In *State* v. *Portsmouth Savings Bank,* 106 Ind. 435, where the State had instituted proceedings in the name of the Attorney General to recover title to the lands under a lake, the court said (p. 462): "The plea under which the defense was made, appellee contends, is a cross-complaint to quiet title. Appellant contends that it is an answer, only, and that as the State cannot be sued, a cross-complaint to quiet title can not be maintained. Although the State cannot be sued, yet when it goes into the courts to recover property it goes as any other suitor, and must accord to the defendant the right to file a cross-complaint and have the title litigated, settled and quieted." The facts and the procedure in that case seem to be identical with those in this case, and while, of course, the decision in another State is not controlling here, the reasoning is fully applicable, and· we do not see why the same reasoning should not apply here.

Counsel for appellant rely upon *People* v. *Sanitary District, supra,* as controlling. That case cites 26 Am. & Eng. Ency. of Law, (2d ed.) 487, as one of the authorities in support of the conclusion reached there. That ·same authority states (p. 492): "A State, when it brings a suit against citizens or other parties, accepts all the conditions that affect ordinary suitors, except that no affirmative judgment, as for the payment of costs, can be had against it."

Counsel for appellant further contend ·that under the provisions of the constitution the State can never be made a defendant in a court of law or. equity by consent of the legislature or any of its ºofficials, and hence it was improper ·for the State to ask the court to settle the title to this added land. In view of the authorities already cited we do not think this is the construction that should be placed upon the constitution. The amended information asked to have the title to this disputed property settled and the cross-bill was germane thereto, and under the authorities it was entirely

proper and a part of the same suit to find, as the decree did, that the title was in appellees.

The decree of the circuit court will be affirmed.

*Decree affirmed.*